[Nos. 12386-3-III; 12387-1-III. Division Three. February 3, 1994.]

THE STATE OF WASHINGTON, *Respondent,* v. STEPHEN CLYDE QUIGG, *Appellant.*

830

*Stephen Clyde Quigg,* pro se, and *Paul J. Wasson,* for appellant.

*Jeffrey C. Sullivan, Prosecuting Attorney,* and *Bruce Hanify, Deputy,* for respondent.

CLARKE, J.[*] — Stephen Clyde Quigg appeals his jury convictions on two counts each of first degree rape of a child and first degree child molestation, contending the trial court erred in admitting certain evidence. He also appeals his 550-month exceptional sentence, contending the court's reasons were unsupported by the record. Pro se, he reargues the facts, claims ineffective assistance of counsel, and claims the prosecutor, judge, jury and police were prejudiced against him. We affirm.

## FACTS

Mr. Quigg was accused of raping his "daughter" S.Q. and beating his "nephew" B.O. on the penis. Although not Mr. Quigg's biological daughter, S.Q. was the daughter of Peggy, a woman whom Mr. Quigg had been divorced from since 1984. S.Q. was born in 1983. Mr. Quigg and Peggy remained good friends after their divorce; in fact, they admitted that their relationship was probably better since then. Peggy continued to do Mr. Quigg's laundry for him. Mr. Quigg went over to Peggy's house almost every day for several hours, then he and Peggy's new husband, Don, went to work the evening shift together at a fruit packing company.

When Mr. Quigg came over to Peggy's, he always played with S.Q. He took her out to the park, out to dinner, and bought her anything she wanted. He was frequently alone with her. He referred to her as his "baby doll"; she referred to him as her "Steve daddy". Mr. Quigg was essentially like

---

[*]Judge Harold D. Clarke is serving as a judge pro tempore of the Court of Appeals pursuant to RCW 2.06.150.

family in Peggy's house, and he was with Peggy at the hospital when S.Q. was born. Peggy considered him like a father to S.Q. — perhaps more so than Don.

Peggy had a sister named Glenda. Glenda knew Mr. Quigg, but she tried to avoid him because, in 1981, she reported to the police that Mr. Quigg had raped her. Mr. Quigg was charged for raping Glenda, but he entered into a deferred prosecution arrangement and was never convicted. Mr. Quigg claimed the charges were false, and Glenda made the report because she was having an affair with him that went sour.

Glenda had a son, B.O., born in 1981. When B.O. was 7 years old, she occasionally dropped him off at Peggy's house after school, then she and Peggy would go out for coffee or run errands. She knew that Mr. Quigg was occasionally at Peggy's, but she usually did not see him because he was in the bedroom or out with S.Q.

In January 1988, Glenda's family moved to Illinois. After the move, B.O. told Glenda he had been sexually abused by Mr. Quigg. B.O. described three incidents at his Aunt Peggy's house, during which Mr. Quigg held a gun to his head and forced him to take off his clothes. Mr. Quigg then repeatedly hit B.O.'s penis with a leather belt, while squeezing his own penis. B.O. said that Mr. Quigg pointed a gun at his head on each occasion and told him, "If you tell, I'm going to blow your head off." Glenda remembered the bruises; at the time, B.O. explained them by saying he dropped the toilet seat on himself. In March 1991, the State filed two counts of first degree child molestation against Mr. Quigg based on acts against B.O.

In June 1991, Peggy asked S.Q. (then 7 years old) if Mr. Quigg had ever touched her. Peggy began asking these questions because S.Q. had experienced bed-wetting and multiple bladder infections, and Peggy had received information that Mr. Quigg may have molested her. S.Q. first denied any bad touching by Mr. Quigg, but then showed her mother, using a teddy bear, where Mr. Quigg allegedly touched her.

The police took S.Q. to Robyn Cyr and Investigator Bill Nance of the Yakima County Prosecuting Attorney's office.

Ms. Cyr and Mr. Nance interviewed S.Q. three times. During each interview, S.Q. explained or demonstrated different ways in which Mr. Quigg had touched her. These included kissing her on the mouth, lying on top of her, fondling her genitals, and putting his finger in her vagina. She also described how he masturbated in front of her. In August 1991, two counts of first degree rape of a child, based on acts against S.Q., were added to the child molestation charges. On defense counsel's motion, all four counts were consolidated for trial.

In December 1991, a jury trial was held. Prior to trial, the court granted in part and denied in part Mr. Quigg's motion to suppress pornographic magazines, videos, and writings seized pursuant to two search warrants. However, the court ultimately ruled all but a handful of these documents inadmissible. One piece of evidence admitted at trial was exhibit 3A, a story handwritten by Mr. Quigg, entitled "The Girl Who Wanted To Be, Just Like, Mommy". The story described in detail some of the same acts he allegedly performed on S.Q. The court also held a reliability hearing to determine the admissibility of certain child hearsay statements under RCW 9A.44.120. The court found most of the hearsay statements reliable. Ms. Cyr testified at trial about grooming, a process by which child molesters gradually introduce their victims to more and more explicit sexual conduct. The jury found Mr. Quigg guilty on all four counts.

In April 1992, after Mr. Quigg had been evaluated by a psychologist for amenability to treatment, the trial court imposed sentence. As to each of the child molestation counts, the standard range was 67 to 89 months. Mr. Quigg was sentenced to 75 months for one count and 150 months for the other. As to each of the child rape counts, the standard range was 98 to 130 months. Mr. Quigg was sentenced to 130 months for one count and 195 months for the other. The court then ran the sentences on each count consecutively, for a total sentence of 550 months. Mr. Quigg timely appealed.

ADMISSION OF CHILD HEARSAY STATEMENTS

Mr. Quigg first argues that the trial court committed two errors in admitting evidence pursuant to the child hearsay statute, RCW 9A.44.120: (1) it admitted hearsay evidence beyond the scope of the statute, since admission of child hearsay is limited to the actual description of the alleged sexual contact; and (2) it made an inadequate record for admitting these statements, thus violating the standards of *State v. Ryan*, 103 Wn.2d 165, 691 P.2d 197 (1984).

We decline to consider the first alleged error, that the court admitted hearsay evidence beyond the scope of the child hearsay statute. Four witnesses — Peggy, S.Q.'s sister-in-law, S.Q.'s neighbor, and Ms. Cyr — testified to statements they heard S.Q. make. A thorough review of the record indicates Mr. Quigg did not object at trial to any of these witnesses' testimony on the ground that it went beyond the scope of the statute. Thus, this issue is raised first on appeal.

■ Generally, appellate courts will not consider an issue raised for the first time on appeal unless it rises to the level of a manifest error affecting a constitutional right. *State v. Scott*, 110 Wn.2d 682, 688, 757 P.2d 492 (1988); *State v. McCullough*, 56 Wn. App. 655, 657, 784 P.2d 566, *review denied*, 114 Wn.2d 1025 (1990); RAP 2.5(a). The proper way to approach errors raised for the first time on appeal is, first, to determine whether the error is truly of constitutional magnitude; if the error fails this test, the court will refuse review. *Scott*, at 688.

■ If both the child hearsay declarant and the hearsay recipients testify at trial and are subject to full cross examination, no issue of truly constitutional magnitude is involved. *State v. Leavitt*, 111 Wn.2d 66, 71, 758 P.2d 982 (1988); *State v. Stevens*, 58 Wn. App. 478, 486, 794 P.2d 38, *review denied*, 115 Wn.2d 1025 (1990); *State v. Warren*, 55 Wn. App. 645, 650, 779 P.2d 1159 (1989), *review denied*, 114 Wn.2d 1004 (1990). In this case, both prongs of the test are met. The child hearsay declarant, S.Q., testified at trial and was in fact fully cross-examined. Likewise, the four challenged witnesses tes-

tified and were fully cross-examined. Thus, this alleged error will not be considered on appeal.

■ The second alleged error regarding the hearsay statements is that the court made a woefully inadequate record for admitting them, ignoring the factors set forth in *State v. Ryan, supra.* A trial court's ruling on the admission of evidence may be reversed only upon a showing of manifest abuse of discretion. *State v. Markle*, 118 Wn.2d 424, 438, 823 P.2d 1101 (1992). We conclude that no manifest abuse of discretion has been shown.

The record clearly demonstrates that the court considered the *Ryan* criteria and made an adequate record of doing so when it admitted the challenged statements. The *Ryan* criteria include the five *State v. Parris*, 98 Wn.2d 140, 654 P.2d 77 (1982) factors:

"(1) whether there is an apparent motive to lie; (2) the general character of the declarant; (3) whether more than one person heard the statements; (4) whether the statements were made spontaneously; and (5) the timing of the declaration and the relationship between the declarant and the witness."[1]

as well as the four *Dutton v. Evans*, 400 U.S. 74, 27 L. Ed. 2d 213, 91 S. Ct. 210 (1970) factors:

(1) the statement contains no express assertion about past fact, (2) cross examination could not show the declarant's lack of knowledge, (3) the possibility of the declarant's faulty recollection is remote, and (4) the circumstances surrounding the statement (in that case spontaneous and against interest) are such that there is no reason to suppose the declarant misrepresented defendant's involvement.[2]

The court carefully weighed these factors on the record, expressly finding that five of the nine favored the reliability of the challenged hearsay statements: (1) there was no apparent motive to lie; (2) the general character of the declarant, S.Q., was reliable; (3) most of S.Q.'s statements were spon-

---

[1]*Ryan*, at 175-76 (quoting *State v. Parris*, 98 Wn.2d 140, 146, 654 P.2d 77 (1982)).

[2]*Ryan*, at 176 (citing *Dutton v. Evans*, 400 U.S. 74, 88-89, 27 L. Ed. 2d 213, 91 S. Ct. 210 (1970)).

taneous, and the others were not prompted by leading questions; (4) there was no showing of any kind of faulty recollection; and (5) there was no reason to suppose S.Q. was misrepresenting Mr. Quigg's involvement, except that perhaps she was *minimizing* his involvement because she loved him. This record indicates no abuse of discretion.

### ROBYN CYR'S TESTIMONY

Mr. Quigg next challenges Ms. Cyr's testimony about grooming, contending (1) she was not qualified as an expert on this topic; (2) testimony on grooming is unfairly prejudicial; and (3) the grooming theory is inadmissible under *Frye v. United States*[3] as it is not generally accepted in the scientific community.

▮ We will not consider the latter two challenges to this evidence, as they were not the basis of objections in the trial court. A party may only assign error in the appellate court on the specific ground of the evidentiary objection made at trial. *State v. Guloy*, 104 Wn.2d 412, 422, 705 P.2d 1182 (1985), *cert. denied*, 475 U.S. 1020 (1986); *Stevens*, at 494. The trial court must be informed of the parties' contentions and theories concerning evidence offered, so that the court may rule on such contentions, consider such theories, and thus avoid committing error. *State v. Garrison*, 71 Wn.2d 312, 315, 427 P.2d 1012 (1967).

▮ Although, as noted above, errors of constitutional magnitude may be raised for the first time on appeal, evidentiary objections not raised in the trial court have generally not been treated as errors of constitutional magnitude. *See Markle*, at 438; *Guloy*, at 421-22; *Stevens*, at 494-95. Specifically in regard to grooming evidence, the courts have treated the issue as ordinary trial error rather than an error of constitutional magnitude. *See State v. Braham*, 67 Wn. App. 930, 934-35, 841 P.2d 785 (1992). In *Braham*, the court broadly construed the objection in the trial court in order to conclude that the error was raised at trial rather than conclude that

---

[3]*Frye v. United States*, 293 F. 1013, 34 A.L.R. 145 (D.C. Cir. 1923).

the error was of constitutional magnitude. We agree that errors in admitting such evidence must be raised at trial to preserve the issue for appeal.

In this case, a thorough review of the record reveals that Mr. Quigg's only attacks on the grooming theory at trial were (1) that Ms. Cyr was not qualified to render an opinion on it; and (2) evidence concerning certain pornographic movies was not germane to it. The grooming theory's admissibility under *Frye* and its prejudicial effect were never raised in the trial court. Thus, the sole question reviewable on appeal is whether Ms. Cyr was qualified to offer an expert opinion on grooming.

■ Qualifications of expert witnesses are to be determined by the trial court within its sound discretion, and rulings on such matters will not be reversed absent a manifest abuse of discretion. *Oliver v. Pacific Northwest Bell Tel. Co.*, 106 Wn.2d 675, 683, 724 P.2d 1003 (1986); *Orion Corp. v. State*, 103 Wn.2d 441, 462, 693 P.2d 1369 (1985); *State v. Swagerty*, 60 Wn. App. 830, 836, 810 P.2d 1 (1991).

Ms. Cyr's qualifications were established at the outset of her testimony. She had 13 years' experience administering a victim services unit, a specialized degree in child abuse and neglect, 80 hours of intensive training at the Harborview Sexual Assault Center in Seattle, and some 2,500 hours of specialized workshops in child abuse. On the subject of child abuse, she had trained police officers, medical professionals, prosecutors, and Child Protective Service workers at the local, state and national levels. She had interviewed more than 3,000 child abuse victims. She testified that based on the above-mentioned experience, she had achieved familiarity with the concept known as grooming — a concept directly related to child sexual abuse. The court did not abuse its discretion in admitting her testimony on this subject.

## ADMISSION OF EXHIBIT 3A

Mr. Quigg next challenges exhibit 3A, a handwritten story entitled "The Girl Who Wanted To Be, Just Like, Mommy" contending it was hearsay, not authenticated, and irrelevant.

Hearsay was not the basis for an objection in the trial court; for the reasons previously discussed, this issue will not be considered on appeal. *Scott*, at 688; *Guloy*, at 422.

As for authentication, there is no doubt exhibit 3A was written by Mr. Quigg. The State called Glenda, who testified that she was familiar with Mr. Quigg's writing and that exhibit 3A was his handwriting. The State then called Officer Woolen, who had executed the search warrants at Mr. Quigg's house. He recognized exhibit 3A as a photocopy of pages from a spiral notebook seized at Mr. Quigg's house and held continuously in police possession until trial. In his direct examination, Mr. Quigg conceded he had written it:

Q: [By defense counsel] And, now, there's this Exhibit No. 3A. Did you write that thing up, sir?
A: Uh, yes, I did.

As for his claims of irrelevancy, Mr. Quigg makes two arguments: (1) there was no proof the story actually played a part in the incident; and (2) the story's probative value was substantially outweighed by its prejudicial impact. Both arguments challenge the trial court's ruling on the admission of evidence, which may be reversed only upon a showing of manifest abuse of discretion. *Markle*, at 438. No abuse of discretion has been shown.

■ Contrary to Mr. Quigg's claim, whether evidence *actually plays a part* in a crime is not the definition of relevant evidence. Rather, relevant evidence is defined as

evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

ER 401; *Davidson v. Municipality of Metro Seattle*, 43 Wn. App. 569, 573, 719 P.2d 569, *review denied*, 106 Wn.2d 1009 (1986).

Exhibit 3A was relevant by this standard. Although Mr. Quigg claimed he wrote the story when he was 13, many elements of the story bore significant similarities to recent events. The story's characters included a prepubescent girl, the girl's mother, the girl's aunt, and a man who was the

"boyfriend" of the girl's mother. The story's author compared various aspects of the aunt's and the mother's nude bodies in detail, and the man in the story had engaged in sexual relations with the girl's mother as well as the girl. Some of the acts with the little girl in the story were similar to acts S.Q. detailed in her testimony.

■ As for the issue of prejudice, we note that in a prosecution for sex crimes, evidence of a defendant's sexually oriented writings is inflammatory on its face and carries a high probability of prejudice; hence, careful consideration of both relevance and prejudice is very important. *State v. Coe*, 101 Wn.2d 772, 780-81, 684 P.2d 668 (1984); *State v. Saltarelli*, 98 Wn.2d 358, 363, 655 P.2d 697 (1982).

In this case, the trial court exercised the requisite careful consideration. The court conceded that exhibit 3A's prejudicial impact was high:

> I have now ruled on its [exhibit 3A's] relevancy, balancing its prejudicial value. And it is high. I will put on the record it is dynamite stuff. There is no question about it. I can't overstate that.

However, the court went on to say that the remarkable similarities between the story and the alleged crimes outweighed this prejudice:

> In the context of this case, where the identification of the young girl and the mother and other family members [as] described in this story goes so clearly toward identification and acts consistent with the testimony described by the girl and consistent with the testimony of Dr. Simms, it is clear its relevance as to identification, course of conduct, motive, intent is so paramount that the prejudicial effect of the evidence will just outweighed [*sic*].

After fully reviewing the record and the excerpts of exhibit 3A admitted, we agree with this assessment — the story was essentially a blueprint of the crime. The court did not abuse its discretion in admitting this evidence.

## EXCEPTIONAL SENTENCE

Mr. Quigg next challenges his exceptional sentence of 550 months, arguing that five of the aggravating factors on which

the court relied to impose the sentence were unsupported by the record. These arguments are without merit.

■ An exceptional sentence is reviewed under a 3-part analysis: (1) Are the trial court's reasons supported by the record? (2) Do the court's reasons justify an exceptional sentence as a matter of law? (3) Is the sentence "clearly excessive"? RCW 9.94A.210(4); *State v. Grewe*, 117 Wn.2d 211, 214, 813 P.2d 1238 (1991); *State v. Nordby*, 106 Wn.2d 514, 517, 723 P.2d 1117 (1986). Mr. Quigg has not argued that his sentence was "clearly excessive". He has argued that the court's reasons did not justify the exceptional sentence — but only to the extent that those reasons were not supported by the record. In the end, each of Mr. Quigg's arguments is a challenge to whether the reasons for an exceptional sentence were supported by the record.

■ Whether the reasons for imposing an exceptional sentence are supported by the record is a factual inquiry; the court's findings will be upheld unless clearly erroneous. *State v. Post*, 118 Wn.2d 596, 614, 826 P.2d 172, 837 P.2d 599 (1992); *State v. Estrella*, 115 Wn.2d 350, 355, 798 P.2d 289 (1990). We conclude that each of the court's reasons was supported by the record.

1. Other Uncharged Crimes.

Mr. Quigg argues that he was sentenced on the basis of additional, uncharged crimes in violation of the real facts doctrine and RCW 9.94A.370(2).

■ However, an ongoing pattern of sexually abusing the same minor victim, involving multiple incidents over a prolonged time, is an exception to the real facts doctrine. RCW 9.94A.370(2); RCW 9.94A.390(2)(f); *State v. Daniels*, 56 Wn. App. 646, 653-54, 784 P.2d 579, *review denied*, 114 Wn.2d 1015 (1990); *State v. Brown*, 55 Wn. App. 738, 755, 780 P.2d 880 (1989), *review denied*, 114 Wn.2d 1014 (1990). So long as there is proof of multiple incidents per count, this exception applies. *Daniels*, at 654; *Brown*, at 755-56. Thus, the question is whether the record supports multiple incidents per count charged. This question is judged by the clearly erroneous standard mentioned earlier.

In this case, the record reveals three witnesses whose testimony supports the court's finding of multiple incidents as to S.Q.[4] S.Q. testified that Mr. Quigg had touched her vagina more than once, starting when she was 4 years old. Ms. Cyr testified that S.Q. told her Mr. Quigg had been molesting her since she was "first born". S.Q.'s doctor testified that the physical evidence demonstrated that S.Q. had suffered chronic, repeated penetrations.

However, the record does not support a pattern of ongoing sexual abuse as to B.O.[5] B.O. testified that Mr. Quigg hit his private with a leather belt at least 10 times on 3 consecutive days. No other evidence of sexual contact with B.O. was ever adduced. We do not think a period of 3 days is long enough to demonstrate an "ongoing pattern" of sexual abuse as to one victim.

Nevertheless, this error is not cause for remand, as we are confident that the court would impose the same sentence without applying this aggravating factor to B.O.'s case. *Post*, at 616; *State v. Pryor*, 115 Wn.2d 445, 456, 799 P.2d 244 (1990).

2. Victim Vulnerability.

Mr. Quigg next argues that the record does not support the court's finding that S.Q. was an especially vulnerable victim.[6] He contends that S.Q. was not particularly vulnerable because she was generally with her mother and was not alone with Mr. Quigg "too often".

Mr. Quigg misconstrues the nature of the test. A particular victim's special vulnerability due to age clearly is

---

[4]As to S.Q., the court found:
"The defendant engaged in on-going acts of sexual contact and sexual intercourse with the victim, 'S', born December 5, 198[3], dating from her early infancy to the age of four to five years."

[5]As to B.O., the court found:
"The defendant engaged in multiple acts of sexual contact with the victim, 'B', born March 21, 1981, constituting gruesome and painful torture of the child."

[6]As to S.Q., the court found: "During the periods of 1988 and 1989, 'S' was a child of three and four years of age and was, therefore, an especially vulnerable victim." The court did not rely on especial vulnerability as to B.O.

a factor which may distinguish particular crimes of indecent liberties from each other. *State v. Fisher*, 108 Wn.2d 419, 424, 739 P.2d 683 (1987). It is reasonable for the court to conclude that a victim's age renders him or her particularly vulnerable and *incapable of resistance. Fisher*, at 425.

The record clearly indicates that S.Q. was only 3 and 4 years old at the time of the crimes. Regardless of how often she was with her mother or alone with Mr. Quigg, the fact remains that when she was alone with him, she was particularly unable to resist because of her extreme youth. Thus, the court's finding was supported by the record. Moreover, contrary to Mr. Quigg's assertion, he was alone with S.Q. almost daily. He admitted that he took S.Q. out frequently.

3. Abuse of Position of Trust.

Mr. Quigg next argues that the record does not support the court's findings that he abused his position of trust to facilitate commission of the crimes.[7] He contends that the proof as to baby-sitting was sorely lacking.

The sentencing judge, as a matter of law, may rely on the trust factor as an aggravating factor in noneconomic as well as economic offenses. *Fisher*, at 427. *See State v. Shephard*, 53 Wn. App. 194, 199, 766 P.2d 467 (1988). The degree and duration of the relationship are indicators of this factor's significance. *Fisher*, at 427.

In this case, the record supports the court's findings. Mr. Quigg occupied a position like a father in relation to S.Q., which he had held since her birth. In practical terms, S.Q. grew up with two fathers — Mr. Quigg and Peggy's husband Don. In S.Q.'s own mind, she referred to Mr. Quigg as her "Steve daddy" and Don as her "Don daddy". As noted above, Mr. Quigg was alone with S.Q. practically every day. The

---

[7]As to S.Q., the court found:

"The defendant acted as a care giver or babysitter for 'S' and used his position of trust to gain access to and have sexual relations with the child."

As to B.O., the court found:

"The defendant exploited his position as a babysitter for 'B' to allow access and sexual contact with the child."

degree and duration of Mr. Quigg's relationship with S.Q. indicate he was a care giver and held a position of trust which he used to facilitate his sexual abuse of S.Q.

The record supports the court's finding that Mr. Quigg held a position of trust in relation to B.O. Although Mr. Quigg denied baby-sitting B.O., the record indicates the following: Mr. Quigg was at Peggy's house almost every day, most of the time from 12:30 p.m. until approximately 3:30 p.m., when he went to work with Don, and he was at Peggy's house when Glenda would drop off B.O. to be baby-sat. He was like family at Peggy's house. He held a position of trust and even love with B.O., to which B.O. testified as follows:

Q: Do you know how many times he struck you the way that you've told us?
A: No.
Q: How did that feel, [B.O.]?
A: I felt like he didn't love me anymore.
Q: Felt like what?
A: He didn't love me anymore.

The court's finding on the basis of this evidence was not clearly erroneous.

4. Future Dangerousness.

Mr. Quigg next argues that the proof was woefully insufficient to support the court's finding of future dangerousness. He contends he had no prior convictions for sexual crimes, and the State failed to prove multiple incidents of sexual abuse with one or both of the children.

Future dangerousness is a nonstatutory aggravating factor which may justify the imposition of an exceptional sentence on a sex offender. *Post*, at 614; *Pryor*, at 454-55; *State v. DeMara*, 62 Wn. App. 23, 28-29, 812 P.2d 898 (1991). On the basis of this aggravating factor, the court may impose an exceptional sentence on a sex offender if (1) the offender has a history of similar acts of sexual deviancy and (2) the opinion of a mental health professional establishes that the offender would likely not be amenable to treatment. *Post*, at 615; *Pryor*, at 455; *DeMara*, at 29.

The first prong, history of similar acts, has been established in this case. As discussed above, a long pattern of similar sexual acts with S.Q. has been adequately proved. Although no pattern of sexual abuse has been shown as to B.O., we are confident that the court would impose the same sentence based on S.Q.'s situation alone. *Post*, at 616; *Pryor*, at 456.[8]

The second prong, dealing with amenability to treatment, is not disputed. In any event, Dr. Roland Dougherty, a licensed clinical psychologist, evaluated Mr. Quigg specifically for sentencing and concluded, "I do not believe that Mr. Quigg is a good candidate for treatment for sexual deviancy." This was based on the fact that Mr. Quigg had apparently been in treatment as a sexual offender in the past with no apparent benefit, and his illegal and harmful activities had not abated despite the intervention of law enforcement and mental health personnel. Therefore, as both prongs have been met, the court's finding is not clearly erroneous.

5. Proportional Punishment.

Mr. Quigg argues that this factor fails for the same reason as the other factors, and that reversal is warranted under *State v. Batista*, 116 Wn.2d 777, 787, 808 P.2d 1141 (1991).

---

[8]Moreover, information about additional similar acts of sexual deviancy came out in the presentence report. Mr. Quigg did object to one incident, regarding acts done to S.Q. when 1 month old, which he told to a correctional officer. However, none of the following acts were objected to at sentencing; hence, they are acknowledged and the court was entitled to rely upon them for sentencing. RCW 9.94A.370(2).

Mr. Quigg admitted doing inappropriate sex acts to other boys.

Mr. Quigg took S.Q. to the park and used her to attract other children to them.

Mr. Quigg was picked up once or twice for indecent exposure, but never convicted.

Mr. Quigg admitted exposing himself to neighborhood girls. The girls would come to his house and look in his bedroom window while he exposed himself.

He had a list of neighbor girls he had seen naked.

Police retrieved a price list for sexual acts (listing the act and the amount he would pay) posted on Mr. Quigg's bedroom window so the neighbor girls could see it. His house is half a block from the elementary school.

He admitted to paying two teenage girls to allow him to "look at their tits". Evidence of this was available in photographs seized from his house.

He misapprehends the *Batista* ruling. The court held that "[w]here multiple current offenses are concerned, in addition to lengthening of sentences, an exceptional sentence may also consist of imposition of consecutive sentences . . .". *Batista*, at 784. The court then noted that when a standard range sentence was "clearly too lenient", it is clearly possible to impose an exceptional sentence either by running the sentences consecutively or by lengthening concurrent sentences. *Batista*, at 787.

However, the "either/or" language of *Batista* was not meant to limit the length of exceptional sentences to the sum of standard range sentences, run consecutively. Washington has already rejected the "doubling rule" as a limit on the length of exceptional sentences. *State v. Oxborrow,* 106 Wn.2d 525, 531-32, 723 P.2d 1123 (1986). Thus, *Batista* does not really speak to the matter at hand.

 More accurately, the court imposed multiple exceptional sentences. It imposed two exceptional sentences — the nonstandard range sentences on two particular counts (150 months on one of the child molestation counts; 195 months on one of the child rape counts). It imposed another exceptional sentence by running the sentences consecutively. *See In re Holmes*, 69 Wn. App. 282, 292-93, 848 P.2d 754 (1993); *State v. McClure*, 64 Wn. App. 528, 534, 827 P.2d 290 (1992).

In cases of multiple exceptional sentences, only one aggravating factor will not support the imposition of two exceptional sentences. *Holmes*, at 293; *McClure*, at 534. However, in this case there were at least five aggravating factors, all of which we have found to be supported by the record. We find no error in the multiple exceptional sentences imposed when supported by such a multiplicity of aggravating factors.

### Pro se Issues

We have carefully read Mr. Quigg's 97-page pro se brief. He has, for the most part, reiterated counsel's arguments. However, he does raise several new issues. We conclude that

none of these arguments have merit, but two require brief discussion.

First, Mr. Quigg alleges that the State's case was not supported by facts, as the witnesses were lying and the evidence was fantasy rather than fact. However, credibility determinations are for the trier of fact and cannot be reviewed on appeal. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990); *State v. Vazquez*, 66 Wn. App. 573, 580, 832 P.2d 883 (1992).

Second, Mr. Quigg contends he did not have effective assistance of counsel at trial. A defendant alleging ineffective assistance of counsel must meet the 2-prong *Strickland* test to prevail. *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 104 S. Ct. 2052, *reh'g denied*, 467 U.S. 1267 (1984); *State v. Ray*, 116 Wn.2d 531, 548, 806 P.2d 1220 (1991). First, the defendant must show that counsel's performance was deficient, involving "errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, at 687; *Ray*, at 548. Second, the defendant must show that the deficient performance prejudiced the defense; this prejudice is defined as "errors . . . so serious as to deprive the defendant of a fair trial . . .". *Strickland*, at 687; *Ray*, at 548.

Judicial scrutiny of counsel's performance is highly deferential. *Strickland*, at 689.

[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland*, at 689.

Mr. Quigg has failed to overcome the presumption that counsel's conduct was reasonable under the circumstances. Mr. Quigg lists 20 instances in which defense counsel was allegedly incompetent, such as failing to investigate the depth of the Yakima River, failing to consult with him in person for more than 15 minutes, failing to call various witnesses to bolster aspects of the defense, and telling his war

 847

stories rather than sticking to the case at hand. None of the activities mentioned fall below the level of reasonable professional assistance; most of the alleged errors deal with attacking the credibility of the witnesses, which counsel vigorously pursued by other means.

We affirm.

SWEENEY, A.C.J., and MUNSON, J., concur.