# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  47772-6-II |
| Respondent, | |
| v. | |
| STANLEY SNEED WILSON, | UNPUBLISHED OPINION |
| Appellant. | |

JOHANSON, J. — Stanley S. Wilson appeals his jury trial convictions for third degree rape and third degree child molestation.  Wilson argues that (1) the admission of a deoxyribonucleic acid (DNA) analyst's testimony violated the confrontation clause.  Wilson also argues that the trial court abused its discretion (2) when it allowed the victim to testify about alleged grooming evidence and (3) when it allowed a police officer to testify about the victim's description of the alleged grooming evidence.  Wilson argues that (4) it was ineffective assistance of counsel not to object to the police officer's testimony.  Further, Wilson argues that (5) the prosecutor committed misconduct during closing argument, (6) it was ineffective assistance of counsel not to object to the alleged misconduct, and (7) cumulative error requires reversal of his convictions.  Holding that there was no reversible error, we affirm Wilson's convictions.

No. 47772-6-II

FACTS

I. BACKGROUND FACTS

In August 2013, 15-year-old K.C.[1] spent the night at the house of her father, J.C. She awoke in the night with Wilson, her father's housemate, breathing heavily next to her. While K.C. pretended to sleep, Wilson sexually assaulted her, including digital penetration. Afterward, K.C. told her father what had happened, and he called the police. Officer Jamie Haske and Detective Clesson Werner responded to J.C.'s call and interviewed J.C., K.C., and Wilson. K.C. went to the hospital where a nurse interviewed K.C. and collected DNA swabs from her.

The State charged Wilson with third degree rape and child molestation of K.C.

II. TRIAL

A. TESTIMONY

1. K.C.'S TESTIMONY

K.C. testified that within a couple months of the sexual assault, while she was browsing the internet on her laptop, Wilson had shown her a movie cover depicting a naked woman. He asked K.C., "Do you want to watch this? It's better." 1 Report of Proceedings (RP) at 129. K.C. declined. The trial court instructed the jury to consider this testimony only for the purpose of evaluating Wilson's disposition toward K.C. and not for any other purpose.

On another occasion a couple months before the assault, K.C. was lying on a couch in her father's living room when Wilson sat down on the same couch. When K.C. moved her feet to

---

[1] We use initials instead of names for victims of sex crimes to protect their privacy. Gen. Ord. of 2011-1 of Division II, *In Re The Use of Initials or Pseudonyms for Child Witnesses in Sex Crime Cases* (Wash. Ct. App.). Also, because of the nature of this case, some confidentiality is appropriate. Accordingly, the name of the father will not be used in the body of this opinion.

2

make room for Wilson, Wilson said she could put her feet "on top of [him]." 1 RP at 149. Instead, K.C. stood up and left the room.

On the night of the sexual assault, K.C. had fallen asleep on a couch in her father's living room. She wore sweatpants and a shirt but no underwear. She awoke to Wilson breathing heavily next to her. She smelled cigarette smoke. K.C. felt pressure on her chest and hands over her pants. Wilson digitally penetrated K.C. while he repeatedly whispered, "Is this okay?" 1 RP at 99. Crying, K.C. remained still for the roughly 20 minutes that Wilson assaulted her. Then Wilson said, "I can't believe you didn't wake up" and walked away. 1 RP at 99.

K.C. waited about 10 minutes and then awakened J.C. and told him that Wilson had "touched [her]." 1 RP at 108. Approximately 20 minutes later, J.C. called the police. K.C. was still crying when the police arrived and when Officer Haske interviewed her. The police took K.C. to the hospital that night where a nurse collected DNA samples. K.C. described the process as "[e]mbarrassing." 1 RP at 112.

2.      J.C.'S TESTIMONY

J.C. testified that when K.C. woke him on the night of the rape, she was severely upset; she was shaking and had difficulty speaking. K.C. told J.C. that Wilson had "touched" her. 2 RP at 174. J.C. remembered that Wilson's light was on and that Wilson was awake, fully dressed, and lying perpendicularly on the bed in his room, which J.C. thought was unusual. By the time the police came, K.C. was beginning to calm down, although she still appeared upset.

3.      POLICE AND NURSE TESTIMONY

Officer Haske testified that K.C. appeared "very upset" and reticent when Officer Haske interviewed K.C. that night. 2 RP at 196. Over Wilson's objection, Officer Haske repeated what

K.C. had told him: that while K.C. pretended to sleep, Wilson sexually assaulted her. Although Wilson renewed his objection, the trial court allowed Officer Haske to testify that K.C. had said Wilson had shown her a "porn movie" and asked if K.C. wanted to watch it with him. 2 RP at 199.

Wilson objected on the basis that J.C. had stated that K.C. was "calming down" when the police arrived. 2 RP at 208. Nevertheless, the trial court found that K.C.'s statements were admissible as excited utterances because K.C. was still upset from the event when the police arrived, even if she was calming down.

Detective Werner testified that he interviewed Wilson that night. Wilson denied ever going into the living room and claimed he was sleeping at the time. Wilson denied touching K.C. Detective Werner collected DNA swabs from Wilson.

The nurse who examined K.C. at the hospital testified that K.C. had described the rape to the nurse. Afterward, the nurse collected K.C.'s sweatpants and DNA from the skin of K.C.'s cheek and from her vagina.

4.      DNA ANALYST'S TESTIMONY

DNA analyst Brad Dixon explained that the DNA testing used here, Y-chromosome DNA testing, ignores female DNA in a sample and matches male DNA to a male lineage. After creating a DNA profile from biological fluids found in a sample, DNA analysts compare that profile to an individual's profile to determine whether the DNA matches that individual's profile.

Analysts can also conduct a comparison analysis to determine how prevalent a DNA profile is in the general population. The analyst compares the profile to a database of profiles, which results in a statistic of how common that profile is. For the Y-chromosome analysis in this case,

4

Dixon used the Y-STR database, which contains about 25,000 United States DNA profiles. That database uses a program to search within the database for matches—other identical profiles. Using a standard statistical calculation, the software then extrapolates how often the profiles occur in the general population from the frequency that the profiles occur in the database.

Dixon explained that he found saliva on the crotch and waistband of K.C.'s sweatpants and the skin and vaginal samples taken from her. He performed Y-chromosome DNA testing on the waistband and found at least 4 male DNA profiles, one of which matched Wilson's profile. Dixon performed a comparison analysis on the profile matching Wilson's to see how common that profile is in the general population. There were no database matches for that profile; from that information, the program extrapolated that statistically 1 in 7,700 United States men would match that profile.

Dixon also performed Y-chromosome DNA testing on the vaginal sample. He found one partial male DNA profile, which was consistent with Wilson's profile. Dixon performed a comparison analysis on the partial profile. The program found the profile occurred 942 times in the database and extrapolated that 1 in 26 United States men would match that profile. Dixon explained that partial profiles generate more matches and thus appear more common than full profiles.

Dixon did not find profiles matching Wilson's in any samples other than the waistband and vaginal samples. During cross-examination, Dixon testified that he had performed DNA analysis on the crotch sample and found a profile of an unknown male who was not Wilson. He also analyzed samples from the sweatpants' inner rear seam and found profiles of at least three males. The major profile from the inner rear seam was not Wilson's.

5.      WILSON'S TESTIMONY

Wilson denied ever asking K.C. to watch a pornographic movie with him or telling her that she could place her legs on him.  He also denied touching K.C. on the night of the rape or going into the living room before the police arrived.  He claimed he was asleep when K.C. awoke J.C.

B.  MOTIONS IN LIMINE

1.      MOVIE INCIDENT EVIDENCE ADMITTED UNDER ER 404(B)

The trial court excused the jury at one point during K.C.'s testimony while it determined whether to admit the evidence that Wilson had asked K.C. to watch a pornographic movie with him.  K.C. explained that she had been sitting down, looking at her laptop, when Wilson held a movie with a naked woman on its front in her face.  Wilson asked K.C. if she wanted to watch the movie, which appeared to be "porn" to K.C.  1 RP at 117.

The State argued that the evidence was relevant because it showed Wilson's attempt to groom K.C. and lustful behavior toward her.  Wilson argued that K.C.'s testimony alone was not enough to establish the incident had occurred by a preponderance of the evidence.

The trial court admitted the evidence because it found that K.C.'s testimony established that the incident had occurred by a preponderance of the evidence and that the evidence revealed grooming behavior.  The probative value of the evidence outweighed its prejudicial effect.  And as discussed earlier, the trial court granted Wilson's request for a limiting instruction to be given immediately after the testimony to the effect that "you may consider the evidence's answers only for the purpose to evaluate the defendant's disposition towards [K.C.].  You must not consider the evidence or answers for any other purpose."  1 RP at 129.

2. FREQUENCY OF Y-STR PROFILE EVIDENCE ADMITTED

The trial court also heard argument about whether to admit the statistical occurrence of the profiles derived from the waistband and vaginal swabs. Dixon explained that he entered data corresponding to the profile that he had created and then the database counted the number of matches in the database and returned a search result. Dixon did not "know anything about the search algorithms" performed by the United States Y-STR database as it counted similar profiles. 3 RP at 296. But Dixon was familiar with the statistical calculation used to extrapolate the frequency of the profile in the United States' population from the number of similar profiles in the database. He explained that the statistical calculation performed by the database was a common equation used in statistical analysis.

Wilson argued that there was "no one to cross-examine as to who made that statistic that was spit out" by the database and that gave the analysis meaning. 3 RP at 302. Wilson also argued that the statistic was a testimonial statement because it was created for the case against Wilson. Wilson claimed that without the statistic, Dixon would not be able to testify at the trial. The State responded that the statistical evidence raised no confrontation clause concerns. The State noted that it was not asking anything about the database other than "using formulas from an ongoing existing data set to come up with statistics." 3 RP at 303.

The trial court allowed Dixon to testify about the statistic as part of the explanation of how Dixon derived his opinions because the statistic was not a testimonial statement.

C. CLOSING ARGUMENT

1. PROSECUTOR'S CLOSING ARGUMENT

The prosecutor began his closing argument by stating,

> In [Wilson's] eyes, [K.C.] wasn't his best friend's little girl. She was an opportunity for sex. His best friend trusted him to live in his house and be around his daughter. He betrayed that trust for the sake of his own selfish sexual desire. He is the reason she had to lay there smelling the smoke on his clothes, listening to his heavy breathing, crying silently in the dark just hoping and waiting for him to stop violating her body.
>
> He is the reason she had to go to the hospital and take part in an embarrassing medical examination. He is the reason that a 20-plus year friendship ended in the blink of an eye. [K.C.] did not deserve what happened to her that night. And the person that inflicted that on her needs to be held accountable for his actions.

4 RP at 397-98. The prosecutor then argued that the evidence showed an escalating pattern of grooming by Wilson. He pointed out that K.C. had consistently told the same account. The prosecutor acknowledged that profiles not matching Wilson's had been found on K.C.'s sweatpants but argued that Wilson's DNA had been found inside K.C.'s sweatpants and vagina. And the prosecutor emphasized that there was only a 1 in 7,700 chance of Wilson's profile being present on K.C.'s waistband and only a 1 in 26 chance of it being present in the vaginal sample.

In rebuttal, the prosecutor concluded by saying that "[K.C.'s] been left to deal with what's happened to her. Now the time has come for [Wilson] to deal with it as well." 4 RP at 430. Wilson did not object to any of the prosecutor's argument.

2.     WILSON'S CLOSING ARGUMENT

In closing, Wilson argued that the "only real source" of evidence against him was K.C.'s allegations and that K.C. was motivated to fabricate her story so that she could have Wilson's room in J.C.'s house. 4 RP at 414. Wilson also argued that his DNA could have been transferred to K.C.'s sweatpants without him ever touching her and that the other profiles present on the sweatpants showed how easily DNA material could be transferred to fabric. Wilson pointed out

that the 1 in 7,700 and 1 in 26 likelihoods of a Y-STR profile match in this case were much lower than the "one in a quadrillion" likelihood present in other forms of DNA testing. 4 RP at 421.

### III. VERDICT AND SENTENCE

The jury found Wilson guilty of third degree rape and third degree molestation of K.C. The trial court sentenced Wilson to a standard range sentence.

### ANALYSIS

### I. CONFRONTATION CLAUSE

Wilson contends that the admission of Dixon's testimony about the statistical occurrence in the United States population of the profiles created from DNA found in the waistband and vaginal samples violated his right to confront the witnesses against him. In particular, Wilson attacks the results of the database's search for matching profiles because Dixon testified that he did not know anything about the search algorithms used. Wilson contends that this alleged error was harmful. We disagree with Wilson's contentions.

### A. STANDARD OF REVIEW AND APPLICABLE LAW

We review de novo whether the admission of evidence violated the confrontation clause. *State v. Jasper*, 174 Wn.2d 96, 108, 271 P.3d 876 (2012).

A criminal defendant has the right to confront "the witnesses against him." U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. The confrontation clause applies when a witness is unavailable at trial. *State v. Price*, 158 Wn.2d 630, 639, 146 P.3d 1183 (2006).

A two-part rule determines whether the testimony of an expert witness who assisted in the preparation of forensic evidence testing implicates the confrontation clause. *State v. Lui*, 179 Wn.2d 457, 470-71, 315 P.3d 493, *cert. denied*, 134 S. Ct. 2842 (2014). In *Lui*, the court held that

an expert comes within the scope of the confrontation clause only if (1) the person is a "'witness' by virtue of making a statement of fact to the tribunal" and (2) the person is a witness "'against' the defendant by making a statement that tends to inculpate the accused." 179 Wn.2d at 462. A "witness" is one who attests to facts; "against" indicates that those facts are adversarial in nature. *Lui*, 179 Wn.2d at 480. This two-part test "allows expert witnesses to rely on technical data prepared by others when reaching their own conclusions, without requiring each laboratory technician to take the witness stand." *Lui*, 179 Wn.2d at 483.

### B. TESTIMONIAL – "PRIMARY PURPOSE" TEST

First, both Wilson and the State contend that whether the statements are "testimonial" depends on the outcome of the "primary purpose" test. We disagree.

In *Lui*, the court analyzed United States Supreme Court case law on the confrontation clause and noted that while the Supreme Court had settled on the "primary purpose test" as the controlling rule for nonexpert witness testimony, there was no controlling rule for expert witnesses. 179 Wn.2d at 470. "In the absence of an authoritative Supreme Court majority rule," the court relied on the plain language of the confrontation clause to reach its working rule for the testimony of expert witnesses. *Lui*, 179 Wn.2d at 470.

Thus, the determination of whether or not the DNA expert testimony here was "testimonial" for the purpose of the confrontation clause is controlled by *Lui* and whether the "testimony" here was made by an unavailable "witness against" Wilson.

### C. "WITNESS AGAINST" WILSON

Wilson challenges the admission of Dixon's testimony in which Dixon described the occurrence statistics generated by the Y-STR database. Wilson argues that the search results were

created by a witness other than Dixon and thus that their admission violated the confrontation clause. Wilson argues that Dixon's lack of familiarity with the search algorithms used by the database violated the confrontation clause because the data that resulted was "against" Wilson. Again, we disagree.

In *Lui*, the court held that to be a "witness" for the purpose of the confrontation clause, the expert must impart factual information to the court. 179 Wn.2d at 480. "This definition does not sweep in analysts whose only role is to operate a machine or add a reagent to a mixture." *Lui*, 179 Wn.2d at 480. "[M]erely laying hands on evidence . . . does not a 'witness' make." *Lui*, 179 Wn.2d at 481.

Even if a witness imparts facts to the court, the witness is not a witness "against" the defendant unless those facts are adversarial in nature. *Lui*, 179 Wn.2d at 480. In *Lui*, the court noted that "[t]he word 'against' implies some . . . capacity to inculpate the defendant." 179 Wn.2d at 481. The court held that the expert was a witness when she created the DNA profile but that the expert only became a witness *against* the defendant once she compared the profile to the defendant's. *Lui*, 179 Wn.2d at 488-89. The necessary inculpatory element was present only at the comparison stage because the data that the expert used did not itself inculpate anyone and did not have any meaning to a nonexpert. *Lui*, 179 Wn.2d at 488.

Here, the particular information to which Wilson objects are the search results that the profiles occurred in the database either 0 or 942 times. As in *Lui*, this data standing alone would have had no meaning or significance to the trier of fact. The knowledge that a profile derived from the waistband or vaginal swabs occurred many times or not at all in a database of profiles sheds no particular light on Wilson's guilt or innocence without more context.

Wilson cannot successfully object to the process in which the database search results were turned into the occurrence statistics because Dixon was available for cross-examination about the calculation the database used. But even the occurrence statistics cannot be characterized as being "against" Wilson. The Y-STR database generated a result that the profiles that Dixon input had either a 1/7,700 or 1/26 chance of being present in a United States male selected at random from the population. Standing alone, this information was not inculpatory. The necessary inculpatory element entered the equation only when Dixon testified that he had found the profiles he entered matched Wilson's and that the database's result told Dixon there was a 1/7,700 or 1/26 chance of that match being coincidental.

For these reasons, we reject Wilson's argument that the search results were "against" Wilson. Because Wilson cannot show that Dixon's testimony included statements of a "witness against" Wilson not subject to cross-examination, we hold that there was no confrontation clause violation.

## II. ER 404(b) PRIOR ACT EVIDENCE

Wilson argues that the trial court abused its discretion when it allowed K.C. to testify that Wilson had shown K.C. a movie with a naked woman on the cover and asked K.C. if she wanted to watch the movie. Because the trial court did not abuse its discretion, Wilson's argument fails.

### A. STANDARD OF REVIEW AND APPLICABLE LAW

We review a trial court's decision to admit evidence under ER 404(b) for abuse of discretion. *State v. DeVincentis*, 150 Wn.2d 11, 17, 74 P.3d 119 (2003). A trial court abuses its discretion if it exercises that discretion "'on untenable grounds or for untenable reasons.'" *State*

*v. Foxhoven*, 161 Wn.2d 168, 174, 163 P.3d 786 (2007) (quoting *State v. Vy Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)).

We require that the trial court apply a four-part test to determine whether the evidence of the prior act is admissible under this rule. "'[T]he trial court must (1) find by a preponderance of the evidence that the [prior act] occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect.'" *State v. Gresham*, 173 Wn.2d 405, 421, 269 P.3d 207 (2012) (quoting *Vy Thang*, 145 Wn.2d at 642).

### B. SUFFICIENCY OF THE PRIOR ACT EVIDENCE

Wilson claims that K.C.'s testimony did not prove that the incident occurred by a preponderance of the evidence because Wilson denied showing the movie to K.C. and because her testimony was too vague to provide evidence of the content of the movie. We disagree.

A court's preponderance finding will by upheld if substantial evidence supports that finding. *State v. Baker*, 89 Wn. App. 726, 732, 950 P.2d 486 (1997). Where a victim's testimony is the only evidence of an incident, it is up to the trial court to determine whether the victim is credible. *Baker*, 89 Wn. App. at 732.

Here, K.C. testified that Wilson had asked her if she wanted to watch a movie and held a movie cover "in [her] face" that depicted a naked woman. 1 RP at 117. K.C.'s testimony, if believed, constituted substantial evidence to support a finding that the movie incident had occurred by a preponderance of the evidence.

Because Wilson cannot show that the trial court abused its discretion when it found the movie incident occurred by a preponderance of the evidence, we reject Wilson's argument.

## C. RELEVANCY OF THE EVIDENCE

Wilson argues that the trial court abused its discretion when it held that the movie incident showed "'grooming'" and was therefore relevant. Br. of Appellant at 18.

We review the trial court's determination of whether the evidence is relevant for abuse of discretion. *Foxhoven*, 161 Wn.2d at 176. The trial court may properly admit grooming evidence as evidence of a plan under ER 404(b). *See State v. Hecht*, 179 Wn. App. 497, 508, 319 P.3d 836 (2014). "Grooming" is a "process by which child molesters gradually introduce their victims to more and more explicit sexual conduct." *State v. Quigg*, 72 Wn. App. 828, 833, 866 P.2d 655 (1994).

K.C.'s description of the movie incident reveals that Wilson wanted K.C. to watch a movie that K.C. believed was pornographic. The incident K.C. described could reasonably be characterized as an example of gradually introducing K.C. to explicit sexual conduct and normalizing such conduct. Thus, the trial court had tenable grounds to find that the evidence showed grooming.

Accordingly, we reject Wilson's argument regarding the admission of K.C's testimony about the movie incident.

## III. EXCITED UTTERANCE

Wilson argues that the trial court abused its discretion when it allowed Officer Haske to testify as an excited utterance that K.C. had told him about the movie incident. Wilson argues that if there was any error, it was harmful because Officer Haske's testimony about the movie incident bolstered K.C.'s testimony. Even assuming there was error, any error was harmless.

Nonconstitutional error in admitting hearsay evidence requires reversal only if there is a reasonable probability that the error materially affected the outcome of the trial. *State v. Neal*, 144 Wn.2d 600, 611, 30 P.3d 1255 (2001) (quoting *State v. Smith*, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)). Improper admission of evidence is harmless if the evidence is of minor significance when compared to the evidence as a whole. *Neal*, 144 Wn.2d at 611.

The effect of Officer Haske's testimony was minimal in light of K.C.'s own testimony consistently describing the movie incident. And the evidence against Wilson was overwhelming given K.C.'s immediate disclosure, her extreme distress, her consistent accounts to other witnesses, and the presence of Wilson's DNA in her vagina and on her sweatpants. Accordingly, even if Officer Haske had not testified about K.C.'s description of the movie incident, there is no reasonable probability that the outcome of the trial would have been materially affected. Accordingly, if there was error, it was harmless.[2]

## IV. PROSECUTORIAL MISCONDUCT

Wilson argues that the prosecutor made an improper appeal to passion during closing argument. Wilson claims that this argument, to which he did not object, resulted in prejudice and was so flagrant and ill intentioned that no instruction could cure that prejudice. Concluding that the prosecutor's argument was proper, we reject this claim.

We review claims of prosecutorial misconduct to determine whether the defendant has proven the conduct was improper and prejudicial. *In re Pers. Restraint of Glasmann*, 175 Wn.2d

---

[2] Wilson also argues that if his counsel waived the challenge to Officer Haske's testimony, then his counsel was ineffective for failing to object. But we address Wilson's challenge to Haske's testimony on the merits, and accordingly we reject his claim of ineffective assistance of counsel on this ground.

696, 704, 286 P.3d 673 (2012). Where a defendant did not object at trial, he has waived any error unless he can establish that the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. *State v. Emery*, 174 Wn.2d 741, 761, 278 P.3d 653 (2012).

Here, Wilson claims that the prosecutor's argument exhorted the jury to convict not on the strength of the evidence, but to ensure Wilson "deals with the consequences in the manner of" K.C. Br. of Appellant at 29. The prosecutor began his closing argument by reminding the jury of K.C.'s suffering during the assault and saying that "[K.C.] did not deserve what happened to her that night. And the person that inflicted that on her needs to be held accountable for his actions." 4 RP at 398. The prosecutor ended his argument by saying that "[K.C.'s] been left to deal with what's happened to her. Now the time has come for [Wilson] to deal with it as well." 4 RP at 430.

But a prosecutor is not muted because the acts committed arouse natural indignation. *State v. Borboa*, 157 Wn.2d 108, 123, 135 P.3d 469 (2006) (quoting *State v. Fleetwood*, 75 Wn.2d 80, 84, 448 P.2d 502 (1968)). And our Supreme Court has held an argument that the defendant had taken away his victims' lives and "'all he offers in return is the loss of his liberty'" did not rise to the level of impropriety that characterizes improper appeals to passion or prejudice. *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 724-25, 327 P.3d 660 (2014). Thus, we conclude that the prosecutor's argument was proper. For this reason, we hold that Wilson's prosecutorial misconduct claim fails.[3]

---

[3] Wilson also argues that if his counsel waived the prosecutorial misconduct argument, then his counsel was ineffective for failing to object. But we address Wilson's prosecutorial misconduct claim on the merits, and accordingly we reject his claim of ineffective assistance of counsel on this ground.

## V. CUMULATIVE ERROR

Wilson argues that even if none of the issues he raises warrants reversal of his convictions when considered in isolation, the cumulative effect of the errors requires reversal. We reject Wilson's cumulative error claim.

Even if each individual error standing alone was harmless, cumulative error may warrant reversal. *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). Cumulative error applies to instances where there are "several trial errors" that alone do not merit reversal but when combined deny the defendant a fair trial. *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). Because there was, at most, a single error (*see* section III, *supra*), we reject Wilson's cumulative error argument.

We affirm Wilson's convictions.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, J.

We concur:

MAXA, A.C.J.

MELNICK, J.

17