IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31314-0-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| REUBEN D. MULAMBA, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |
| | ) | |

FEARING, J. — Reuben Denis Mulamba (Denis) challenges his convictions for abusing the children of his girlfriend. He principally argues that the trial court impermissibly allowed evidence under the Washington child hearsay statute, RCW 9A.44.120. Since we find any error to be harmless, we affirm.

FACTS

Ashley Eli begat two children: S.E., a boy born on April 15, 2003, and J.R., a girl born on February 24, 2007. In the summer of 2011, Eli and the two children lived in Moses Lake.

In August 2011, Ashley Eli met Denis Mulamba while smoking outside a bar in

Moses Lake. By the end of the night, Eli and Mulamba exchanged phone numbers. Mulamba attended Central Washington University in Ellensburg, but returned to Moses Lake on weekends to work at Golden Age, an adult care facility that his mother owned. Eli worked as a certified nurse assistant at a different adult care facility, the Blue Goose.

Ashley Eli and Denis Mulamba cultivated a close relationship. According to Eli: "We hung out like every day, even with my kids and he [Mulamba] was always real sweet" to both her and her children. Report of Proceedings (RP) at 124-25. In October 2011, Mulamba rented a two bedroom apartment in Ellensburg. Beginning in November 2011, Eli and J.R. stayed at Denis Mulamba's apartment in Ellensburg from Monday through Thursday, while S.E. stayed with his grandmother in Moses Lake, where S.E. attended school.

In December 2011, Ashley Eli and Denis Mulamba's relationship soured. Mulamba criticized Eli for a lack of discipline of her children. Eli's mother ceased caring for the children when Eli worked, and this situation angered Mulamba.

After Christmas 2011, the Blue Goose terminated Ashley Eli's employment. Eli and her children then moved indefinitely into Denis Mulamba's Ellensburg apartment. The two believed that, even if they stopped dating, they would remain best friends and housemates. Eli agreed to pay half the rent and half the power bill.

By early January, Ashley Eli had failed to gain employment in Ellensburg. Arguments between Eli and Denis Mulamba increased. Mulamba and Eli quarreled

2

about bills and Mulamba insisted he need not support Eli and her children. Mulamba complained about the noise of the children in his diminutive apartment. When Eli questioned Mulamba about his anger, Mulamba responded that he would be cheerful if Eli disciplined her children. Mulamba called Eli a "bad mom." RP at 138. S.E. was then eight years old, and J.R. was four.

On January 13, 2012, Ashley Eli and Denis Mulamba vociferously quarreled again about Eli's lack of discipline of her children. Either Mulamba dismissed Eli from his apartment or Eli voluntarily left. As Eli loaded her two children in her car, Mulamba scattered some of Eli's belongings outside. Mulamba then commandeered the keys to Eli's car and refused to allow her to leave. Police arrived, recovered Eli's keys, and Eli departed. Eli's shoes, her makeup, her important documents, her children's toys, and the children's clothing remained at Mulamba's apartment.

Within one day, Denis Mulamba telephoned Ashley Eli, apologized to her, and entreated her to return to his apartment. Eli returned, in part, because many of her possessions and the children's belongings remained at Mulamba's home. The arguments continued during the ensuing days.

In mid-January, J.R. wet the bed. Ashley Eli spanked J.R. for the accident. Mulamba loudly told Eli that the spanking "wasn't discipline." RP at 149. Mulamba, unaccompanied by Eli, removed J.R. to the garage, where neighbors could not hear his ensuing behavior toward J.R. Eli does not know all the measures Mulamba meted on J.R.

3

in the garage. Eli appeared momentarily and noticed J.R. missing her shirt and performing wall sits. A wall sit consists of one resting her back against a wall and pretending to sit in a chair.

Beginning in mid-January 2012, Denis Mulamba assumed the punishment of J.R. and S.E. Mulamba beat the two children with a belt. Ashley Eli did not object, because her mother disciplined her siblings with a belt. Mulamba gradually increased the severity of the beatings, moving to a thicker belt, then an iron cord, and ending with a co-axle cable. If S.E. or J.R. failed to wall sit for a sufficient time during an episode of discipline, Mulamba whipped the child and insisted on more wall sitting. When riding from Moses Lake to Ellensburg one day, Mulamba threatened to pinch S.E. with pliers. Later that night, Mulamba threatened to cut J.R.'s hair and burn her with a clothes iron.

Ashley Eli enrolled S.E. in Ellensburg school the week of January 23. That same week, Eli noticed bruising on J.R.'s body. Eli demanded that Denis Mulamba cease his methods of discipline. Mulamba refused.

By late January 2012, a pattern replayed itself in the Ellensburg household whereby Denis Mulamba harshly disciplined a child, and Ashley Eli undertook to leave Mulamba's apartment. Eli packed belongings, and Mulamba grabbed the belongings from her. Mulamba seized Eli's keys, wallet, and telephone. Eli cried. Eli traversed to the front door to exit, and Mulamba blocked and locked the door. On several occasions, Mulamba embraced Eli and cooed: "Please, stop crying. It's okay. I am sorry. I am not

4

going to do it anymore." "[Y]ou know I am not a bad person." "I love you and I love your kids and I am not going to do this anymore." RP at 163. The two recurrently reconciled, and Eli remained with her children at Mulamba's home. On some occasions, Mulamba told Eli that if she reported his conduct to law enforcement, he would claim that she injured her children.

On January 29, 2012, J.R. vomited her dinner. J.R. undressed for a bath, at which time Ashley Eli comprehended the extent of her daughter's injuries. Bruises blotched J.R.'s entire body. She suffered black wounds on her legs. Eli confronted Mulamba, who insisted that J.R. must be scratching herself. Eli knew that the wounds must be cleaned to avoid infection, but she could not bring herself to perform the task. Mulamba finished bathing J.R. and, after the bath, cleansed the wounds with hydrogen peroxide.

Later on January 29, Denis Mulamba threatened S.E. to either burn him or force him to stand outside until morning. Mulamba gave S.E. a choice between the two options. Mulamba retrieved a clothes iron but did not use it to burn S.E. He instead beat S.E. with the iron on the boy's back. Denis Mulamba told Ashley Eli that, if she were not a bad mother, he would not need to discipline the children.

On the night of January 29, Ashley Eli, with her two children, finally left Denis Mulamba's apartment. Eli wrapped her naked daughter in a sheet and laid her in the car. Young S.E. donned his shoes and left the home without a coat. Eli left without shoes and a coat. Eli rented a motel room. She carried J.R. into the room, because of snow. J.R.

was too ill to walk.

On January 30, 2012, Ashley Eli met with Denis Mulamba at his apartment in the hopes of retrieving shoes, coats, and clothes for herself and her children. Mulamba had, in the meantime, called and apologized to Eli. When Eli arrived at the apartment with her children, Mulamba expressed anger because J.R. was not in a car seat. Eli had chosen to allow J.R. to sit in the car free from restraints because of her wounds. Mulamba threw Eli's and her children's belongings onto a sidewalk. Eli grabbed the possessions and stuffed them in her car.

Ashley Eli returned with her children to the same Ellensburg motel. She noticed an odor of sickness and infection on J.R. Eli paid for another night at the motel, and she asked the front desk if she could work to pay for a room. She explained that she had no place to live and her friend abused her children. The motel referred Eli to Aspen Women's Domestic Violence Shelter.

The next morning, Ashley Eli bought J.R. a nightgown, fluffy robe, and socks from a consignment store, fed her children, and went to Aspen Shelter. Eli explained to Aspen supervisor Kathleen Coppin that she and her children needed housing because her boyfriend beat the children. Eli refused to identify her boyfriend. Coppin summoned, by phone, Ellensburg Police Department Detective Tim Weed. Weed traveled to Aspen. After the adults discussed the situation, Coppin drove Eli, J.R., and S.E. to the police station for interviews.

6

At the Ellensburg police station, Ashley Eli again refused to identify her boyfriend. So, Detective Tim Weed interviewed S.E. The transcript for the interview reads, in part:

> WEED: Okay. What made 'em hurt?
> [S.E.]: Um, I don't remember. I really don't remember what made us um, hurt at all. But I know we just hurt really bad. I don't know why we hurt. I don't even know why um, me and [J.R.] are hurting this bad. Usually we don't hurt this bad. If we hurt this bad, then usually after two days it's gone, but nope, not with me and my sister yet, we um, still hurt, and I don't know why.

Clerk's Papers (CP) at 706. S.E. reported to Weed that he had earlier hit his head.

While Detective Weed interviewed S.E., Kathleen Coppin sat with J.R. at the police station. Coppin noticed that J.R. sat uncomfortably, whined painfully, and moved slowly. J.R. expressed that her stomach hurt and she wanted to lie on the floor. Coppin concluded J.R. needed hospital care. After Detective Weed ended his interview with S.E., Coppin drove Ashley Eli, J.R., and S.E. to Kittitas Valley Community Hospital's emergency room.

Nurse John Yoder first examined J.R. at the hospital. Yoder noticed bruising on J.R.'s left side and arm and stripes on her back. Yoder also smelled an aroma of dead flesh and infection. He raised J.R.'s nightgown and saw severe burns on the girl's legs. Yoder retrieved Dr. David Frick.

While the emergency room waited for the arrival of Dr. Frick, Erik Davis tended to S.E. As Davis changed S.E. into a hospital gown, Davis noticed "raised edge marks"

7

that covered the young lad from his shoulder down to his ankle. RP at 536. S.E. told Davis he had been whipped with belts and wires and pinched with pliers.

Dr. David Frick examined J.R. and assessed her condition as serious to critical. Frick observed second and third degree burns on J.R.'s thighs and buttocks. Dr. Frick immediately transferred J.R., by airlift, to Seattle's Harborview Burn Center.

David Frick also assessed S.E. S.E. told Frick that his mother's boyfriend had abused him with belts and wire. Frick feared head and liver injuries to S.E. and transferred the boy, by ambulance, to Harborview.

Detective Tim Weed interviewed Ashley Eli at Kittitas Valley Community Hospital. After completing the interview, Weed arrested Eli for criminal mistreatment, because of her failure to obtain needed medical care for her children.

At Harborview Medical Center, Dr. Kenneth Feldman examined J.R. and S.E. Dr. Feldman diagnosed J.R. with a urinary tract infection, anemia, and kidney failure. Dr. Feldman opined that J.R. could have died from the kidney failure, if left untreated. Dr. Feldman found S.E. severely injured throughout every portion of his young body, except his head. Dr. Feldman believed "multiple blows" caused S.E.'s injuries. RP at 357.

On February 2, 2012, with Detective Tim Weed present, Child Protective Services supervisor, Marti Miller, interviewed S.E. When asked to explain his injuries, S.E. told Miller:

8

My mom's boyfriend was there um—if we didn't listen we got a belt or the wire and um—the night when my mom decided to move he threatened to burn me with an iron. Um—or um—he threatened to burn me with an iron or he would make me go stand outside until it was morning. So I—he told me to choose. I didn't want to choose so he said he's choosing and I guess he chose to burn me with an iron.

CP at 681. The interview continued:

> MILLER: Anything else that has been used on you?
> [S.E.]: Just a pair of pliers.
> MILLER: Ok. And so tell me about that. What do you mean?
> [S.E]: Um—it was a long time ago. Um—we were in the car um—so my mom's boyfriend was mad so he grabbed a pair of pliers cause he was mad at me and then he started pinching me right around—right here.
> MILLER: Ok. And so you were in a car?
> [S.E.]: Yeah.
> MILLER: Where were you guys going?
> [S.E.]: We were going to Moses Lake and um—then the night when we decided it, when my mom decided to leave he used his hands and grabbed my stomach hard.
>
> . . . .
>
> MILLER: Ok. And you said you and [J.R.] got beat. What—what was that about?
> [S.E.]: Um—I can't remember but I think it had to do with something um—my mom's boyfriend the day when we were going back, coming back here to Ellensburg um—she made me um—get out of the car and um—we drove way back and I was on his property and he didn't want me on there and then um—he made my mom drive all the way up to the end of the road and then he made me run after the car.
> MILLER: Ok. So you—you were—what town when you were doing that?
> [S.E.]: We weren't in the town we were in a country and um—and I couldn't run so I just fell down. He said not to do that um—I just couldn't run. My legs were hurting. So he started slapping me um—and then I finally got up, ran to the car, my shoes were off. And then I just got in, my mom got my shoes and then we left and then um—he said the next day which was Sunday I was um—gonna get beat to death.
>
> . . . .

9

>            MILLER:  Has anybody told you not to talk about anything or to,
> you know say a certain thing?
>
>            [S.E.]:  Um—my mom was—didn't want me telling you guys this
> because she didn't want her boyfriend to um go to jail because this is his
> last year of college.  He's um—gonna graduate really soon.
>
>            MILLER:  So what—what'd she say to you?  What were her . . . ?
>
>            [S.E.]:  She said um—not to tell you guys about this and um—cause
> she didn't want him to lose um—his um lose his um—career in college.
>
>            MILLER:  Ok.
>
>            [S.E.]:  And um—I think I um—kind of know his name.

CP at 684-85, 697 (third alteration in original).

Marti Miller also interviewed J.R. on February 2.  Miller started by asking J.R.

about her day:

>            MILLER:  Okay.  Yeah.  What else happened today?
>
>            [J.R.]:  And I got some cheerios for breakfast.
>
>            . . . .
>
>            MILLER:  Oh, those shoes, those slippers?
>
>            [J.R.]:  Yeah.  They brought me in some—some (inaudible).
>
>            MILLER:  Oh, wow.  Okay.  You had a big day.  Yeah.  Okay.
> Well, I was um—wanting to talk with you a little bit.  I heard something
> might have happened to you.  Can you tell me what happened to you?
>
>            [J.R.]:  Yeah.  I just puked.
>
>            MILLER:  You just puked a little bit ago?
>
>            [J.R.]:  Yeah.
>
>            MILLER:  Yeah.  Okay.
>
>            [J.R.]:  They cleaned it up.
>
>            . . . .
>
>            MILLER:  Yes, they did.  Alright.  Well, I heard that something
> might have happened to you and your brother?
>
>            [J.R.]:  Well, I don't know what happened to my brother though.
>
>            . . . .
>
>            MILLER:  Yeah.  Yeah.  We just talked to your brother a little bit
> ago and so he—he told us what happened to him.  Um—but we wanted to
> know what happened to you and—and what's going on here for you. Okay?
>
>            [J.R.]:  Okay.

10

MILLER: Okay. So, tell me about—why—why you're in the hospital. What's going on?

[J.R.]: Um—one day I um—(inaudible - background noise) and I didn't eat, so the school met my mom (inaudible) to the hospital.

MILLER: Alright and so, what was—what was going on with um— what was some things going on that caused you to have to come to the hospital?

[J.R.]: Um—well, I could have puked if I didn't come here and I could have gone sicker and sicker.

MILLER: You would have been sicker and sicker.

[J.R.]: I would have.

MILLER: You would have. Okay. Alright.

[J.R.]: And also, I, (inaudible). Also, those are all the reasons why. I don't remember any other reasons.

MILLER: So, tell me who you live with [J.R.].

[J.R.]: I live with—well, I only live with my mom. Not live with my dad.

MILLER: Okay and who else?

[J.R.]: My brother and that's all.

MILLER: Okay, so your mom and you and your brother?

[J.R.]: Yeah. Yeah. Even uh, (inaudible).

MILLER: That's okay. Okay.

[J.R.]: I'm trying to remember.

MILLER: You thinking?

[J.R.]: Yeah.

MILLER: You are?

[J.R.]: (Inaudible).

MILLER: Okay, so you live with your mom and your brother and anybody else?

[J.R.]: Yeah. Um—no.

MILLER: Okay. Your brother told me that um—there's somebody else that lives with you guys.

[J.R.]: Um—there is? But I just don't know who.

MILLER: Okay.

[J.R.]: It is.

MILLER: Okay. Do you have a name?

[J.R.]: Hmm?

MILLER: You don't have a name for that person?

[J.R.]: No. I don't know his name.

11

MILLER: You don't know his name. Okay.

[J.R.]: (Inaudible). I don't know that either.

MILLER: You said he's a boy? Is that what you said?

[J.R.]: No. I don't know if he's a boy or girl.

MILLER: You don't know. Okay. Okay and did he live with you guys? With your mom?

[J.R.]: The person?

MILLER: Yeah.

[J.R.]: Um—yeah. I saw—he always had to live by ourselves. That person never lived with us.

CP at 665-67.

During the Miller interview, J.R. spoke about her injuries:

MILLER: Okay. Okay. So, tell me about—tell me your owies here.

[J.R.]: Well, they hurting. Every once in a while they start to hurt.

MILLER: Okay. Which owie hurts the most?

[J.R.]: My butt.

MILLER: Your butt hurts the most?

[J.R.]: Yeah.

MILLER: Okay. What happened to it?

[J.R.]: Uh, one day I fell asleep and it—I was itching real hard sleeping and it's falling apart.

MILLER: It's falling apart.

[J.R.]: Yeah.

MILLER: Okay. How did you get the owie on your butt?

[J.R.]: Cause I was itching it.

MILLER: You were itching it. Okay.

[J.R.]: And sleeping (inaudible). (Inaudible). I was awake. I was awake.

MILLER: You was awake.

[J.R.]: No. When I was sleeping I was itching it.

MILLER: Itching it when you were sleeping.

[J.R.]: Yeah.

MILLER: Okay. What are some of your other owies?

[J.R.]: Well, on my legs.

MILLER: Okay.

[J.R.]: And on my arm and one right there.

MILLER: Okay. How'd you get those owies?

[J.R.]: Um … I don't know how I got these two owies up here.

MILLER: How'd you get the owies on your legs?

[J.R.]: Um … by getting spankings on my legs.

MILLER: You got spankings on your legs?

[J.R.]: Yeah.

MILLER: What from or who—who gave you the spankings?

[J.R.]: Dad.

MILLER: [D]ad did.

[J.R.]: Yeah.

MILLER: Okay and what did he spank you with?

[J.R.]: Belt.

MILLER: A belt. Okay. Do you remember what that belt looked like?

[J.R.]: No.

MILLER: No. Okay. Alright.

[J.R.]: It was long.

MILLER: It was a long belt?

[J.R.]: Yeah.

MILLER: Okay.

[J.R.]: It's a grown up one.

MILLER: It's a what?

[J.R.]: It was grown up one though.

MILLER: A grown up one?

[J.R.]: Yeah.

MILLER: Okay, okay.

[J.R.]: It was my mom's belt.

MILLER: It's your mom's belt?

[J.R.]: Yeah. It's a rainbow belt.

MILLER: A rainbow belt?

[J.R.]: Yeah.

MILLER: Wow. Okay. Where's the rainbow belt usually kept?

[J.R.]: Um - I don't know.

MILLER: Okay.

[J.R.]: [W]here it usually stays.

MILLER: Okay. Um—did you get any other spankings?

[J.R.]: Uh, I get the spankings when I get bad, and I be bad.

MILLER: Spankings when you're bad?

[J.R.]: Yeah.

MILLER: Okay. You get spankings on your legs. Where else?

[J.R.]: And on my butt where (inaudible).

MILLER: On your butt.

[J.R.]: Yeah.

MILLER: Where else?

[J.R.]: (inaudible) I got a spanking and I (inaudible) ...

MILLER: Spanking ....

[J.R.]: On the—where the (inaudible).

MILLER: Okay. You think you got slapped on the arms.

[J.R.]: It hurts my arms. (Inaudible) and I don't know how I got these, but I think it's I uh getting slapped.

MILLER: Okay. Who did the slapping? Who did that?

[J.R.]: I don't know. (Inaudible). And (inaudible).

MILLER: So - okay. Mom slapped you on the mouth and how did you get slapped on the arms?

[J.R.]: Uh, I didn't get slapped on the arms though.

MILLER: You didn't get slapped on the arms though?

[J.R.]: No.

MILLER: Okay. How'd you get the owies on the arms then?

[J.R.]: I don't know.

MILLER: You don't know. Okay. Alright. How about any other owies you have anywhere.

[J.R.]: Um—well, (inaudible) back (inaudible).

MILLER: Okay. Yep. I do see some owies on your back. You can—that's okay honey. You can lay down. You're good. I don't want you to hurt yourself. How'd you get the owies on your back?

[J.R.]: I don't know either.

MILLER: You don't know either. Okay. Okay. How about - I saw something on the back of your head. Do you know what happened back there?

[J.R.]: No.

CP at 667-70 (some alterations in original).

During the February 2 interview, J.R. told Marti Miller that her mother instructed her to not disclose the name of her boyfriend:

14

MILLER: Okay. So, I just wanna be sure I heard you right [J.R.], okay?

[J.R.]: Okay.

MILLER: So, dad did some spankings with the belt on your butt and your legs. And . . .

[J.R.]: No spank me with his hand on arm and butt but I—but don't tell my mom that I told you that cause she told me to tell you guys only that I—we got a spank with the belt.

MILLER: Okay. You know what? You—you did a good job cause we promised to tell the truth today, remember and the truth is that you got spanked on the butt with a belt and then sometimes with a hand. But mom—mama didn't want you to talk about that?

[J.R.]: No.

MILLER: Okay, but you—you did the right thing by telling the truth. Remember that was what we agreed too when we first started talking, so good job. Okay.

[J.R.]: Okay.

MILLER: What else did mama tell you?

[J.R.]: She also told us not to tell you guys dad's real name and just tell you guys that his name is dad.

MILLER: Okay.

[J.R.]: And that—that we don't know who his name is.

MILLER: Okay, but she didn't want you to tell who your dad's name was?

[J.R.]: Nope.

MILLER: Okay.

[J.R.]: It's (inaudible).

MILLER: Do you know what his name is?

[J.R.]: No.

MILLER: Okay.

[J.R.]: Um—yeah, but I don't—I just don't want them to because um—I just—cause he has last day of school and he's still (inaudible) go to school every day.

MILLER: So, you don't want him to go to jail?

[J.R.]: No because I don't want him to miss school.

MILLER: Okay, so he can finish school?

[J.R.]: Yeah.

MILLER: Okay. Okay. So, mom said not talk about it.

[J.R.]: No.

15

MILLER: Okay. So, any other owies you can tell me about and how you got those owies?

[J.R.]: Um ... there's no other owies.

. . . .

MILLER: Mom what?

[J.R.]: Just like mom slapped me.

MILLER: Just like mom did to you?

[J.R.]: Yep.

MILLER: Okay and I just want to be clear, when mom slapped you with her hand where did she—what part of your body did she slap?

[J.R.]: I don't remember.

MILLER: You don't remember.

[J.R.]: Don't tell her I said that.

MILLER: Okay. Did she ever use anything else to hit you?

[J.R.]: Um—no.

MILLER: How about did dad ever use anything else to hit you?

[J.R.]: Yeah. He used uses a wire too.

MILLER: A wire?

[J.R.]: Yeah.

MILLER: Okay. Do you know what that wire looks like?

[J.R.]: [W]ell, it's black.

MILLER: It's a black wire?

[J.R.]: Yeah.

MILLER: Do you know where—where that wire is at? Where's it at? Where does it come from?

[J.R.]: It was something in my bedroom, but it's not [S.E.'s] bedroom it's my bedroom.

MILLER: And so the wire sometimes was in your bedroom?

[J.R.]: Yeah and I found it in there and something (inaudible). Well, one day um—he didn't find (inaudible) in that room and then (inaudible) told me to keep (inaudible) and then uh . . . I did and (inaudible) from the blanket and then I—and then [S.E.] got a spanking with it because he wasn't listening to what Dennis said.

MILLER: Okay. He wasn't listening to what Dennis said?

[J.R.]: No and don't tell him that I said that either.

MILLER: Okay. Okay.

[J.R.]: I supposed to say dad.

CP at 670-73 (some alterations in original).

PROCEDURE

The State of Washington charged Denis Mulamba with four counts: (1) assault of a child in the first degree against J.R. in violation of RCW 9A.36.120, (2) assault of a child in the second degree against S.E. in violation of RCW 9A.36.130, (3) criminal mistreatment in the first degree against J.R. in violation of RCW 9A.42.020, and (4) criminal mistreatment in the second degree against S.E. in violation of RCW 9A.42.030. For all four counts, the State additionally alleged that Mulamba "knew or should have known that the victim of the current offense was particularly vulnerable or incapable of resistance, under RCW 9.94A.535(3)(b)." CP at 306. After the State filed the information, Denis Mulamba's defense counsel interviewed S.E. and J.R.

The State moved under RCW 9A.44.120, the child hearsay statute, to admit J.R.'s and S.E.'s statements to law enforcement, child social workers, and medical personnel. The State asked the trial court to find the children competent as witnesses and admit the statements made by them through the testimony of Ellensburg Police Department Detective Tim Weed, Child Protective Services Supervisor Marti Miller, Aspen Women's Domestic Violence Crime Victim Manager Kathleen Coppin, and medical personnel. The State informed the trial court that S.E. and J.R. would testify at trial. The State attached transcripts from the interviews to its motion.

Before the motion hearing, the trial court reviewed law enforcement's video-taped

17

interviews of the children and transcripts of defense counsel's interviews of S.E. and J.R.

The trial court admitted the hearsay statements. In turn, the trial court entered the

following findings of fact and conclusions of law:

## I. FINDINGS OF FACT

1. On February 2, 2012, [S.E.], 8, and his sister [J.R.], 4, provided statements to a social worker and a police detective, about physical acts of abuse the defendant inflicted upon them.

2. The interviews were conducted separately at Harborview Hospital.

3. The interviews were audio-video recorded.

4. The court reviewed the recordings and transcripts of the same in their entirety and incorporated them by reference.

5. The court also reviewed the defense attorney's recorded interviews of each child.

[6]. The court reviewed the parties' legal memorandums.

## II. CONCLUSIONS OF LAW

1. All witnesses are presumed competent.

2. There is no evidence presented that the children are incompetent to testify.

3. The recordings make it clear that the children understand both what it means to tell the truth and why it is important to tell the truth.

4. They understand simple questions and intelligently respond corresponding with their ages.

5. The children's answers were spontaneous in response to questions asked by their interviewers.

6. The children's responses are relatively consistent.

7. The children demonstrate a good sense of timing and being able to recall and describe what happened.

8. When the defendant's attorney questioned the children, out of court, the children were still able to recall what physical acts of abuse they say the defendant inflicted upon them.

18

9. Any omissions, by the children, are not the result of faulty recollection as opposed to the children just not wanting to talk about what they do not want to talk about.

10. The social worker and/or detective cannot testify as to statements one child made about any acts of physical abuse the other child may have suffered.

11. The social worker and/or detective can only testify as to what statements each child made as to physical acts of abuse incurred by the child who made the statement.

12. The statements constitute testimonial evidence.

13. However, the State of Washington advises that the children are available to testify.

14. The court's findings are premised upon the children testifying at trial before the social worker and/or detective testify.

CP at 822-24. Thus, on the condition that J.R. and S.E. testify first, the trial court ruled

J.R.'s and S.E.'s out-of-court statements admissible under RCW 9A.44.120.

S.E. and J.R. both testified during the jury trial. S.E. testified that Mulamba hit

him with a belt. J.R. identified Mulamba as "[t]he guy who hurt me." RP at 477.

Detective Tim Weed testified to his January 31, 2012 interview of S.E. Weed related to

the jury S.E.'s statements that he and his sister were hurting.

During trial, Marti Miller testified extensively concerning the children's

statements during her respective interviews of each. On appeal, Denis Mulamba

challenges much of Marti Miller's testimony as inadmissible under the child hearsay

statute, among other grounds. Miller testified, without objection, to: when S.E. indicated

the family moved to Ellensburg, the children's statements that their mother did not

participate in the beatings, and J.R.'s statements that her mother instructed her to not

identify Mulamba by name. Mulamba twice objected to Marti Miller's testimony that

J.R. told her that Mulamba had beat S.E.:

> Q. Okay. Did you have an opportunity to ask about [S.E.] injuries?
> A. I did. I asked [J.R.] if she knew anything that had happened to [S.E].
> Q. What did she say?
> [DEFENSE COUNSEL]: Judge, separate hearsay objection on top of the other ones.
> THE COURT: Okay. So noted.
> Q. (By [THE STATE]) "What did she say?"
> A. She said he got some "owies" by getting spankings too.
> Q. That's how she described it? Spankings?
> A. He got spankings on his butt and on the leg, too?
> Q. Spankings. Did you ask [J.R.] who spanked [S.E.]?
> A. I did. I asked her who spanked him on the leg with the belt and she said, "Same person, our dad."
> Q. Were those her words "same person our dad"?
> A. Correct.
> Q. Did you ask [J.R.] if her mother or their mother hit [S.E.]?
> A. I said, "Who slapped him with the hand?" And she said, "um, mom." And I clarified "mom did?" And she said, "yeah." . . .
>
> . . . .
>
> Q. In response to your question about half way down your question, "So the wire sometimes was in your bedroom?" "Uh-huh." Do you recall what [J.R.] said?
> A. I do.
> Q. What did she say?
> A. If I can look here for a minute. There was some inaudible, some trouble with the transcriptionist hearing everything she said. But her reply was, "Yeah, in there." And something inaudible. "Well one day um he didn't find . . ." inaudible. ". . . in that room and then . . ." inaudible. ". . . told me to keep . . ." inaudible ". . . and then I did and . . . inaudible ". . . from the blanket and then [S.E.] got a spanking with it because he wasn't listening to what [Denis] said."
> Q. [Denis] said?
> A. Correct.
> Q. Who utilized those words?

A. [J.R.].

Q. With [J.R.] saying "[Denis] said" what did you ask?

A. I asked, "He wasn't listening to what [Denis] said?" So again repeating words that she's given me.

Q. You utilized her words now at this point?

A. Correct.

Q. Okay. And what did she say when you asked he wasn't doing what [Denis] said?

A. She actually said—

[DEFENSE COUNSEL]: Judge, I am going to object. Statute requires statements about abuse to that child not other children—

THE COURT: Sustained.

[THE STATE]: Okay. We'll move on.

RP at 592-94 (some alterations in original). Mulamba also objected when Miller testified to: S.E.'s statements about how many times he was beaten, S.E.'s statements that Mulamba threatened to burn him with an iron, and S.E.'s statement that Mulamba had threatened to beat him to death.

Denis Mulamba also contends that Marti Miller improperly vouched for J.R.'s veracity, when testifying:

A. I asked her why she was at the hospital? What happened?

Q. What did she say?

A. She said they washed her off.

Q. Did that prompt you to ask any other questions?

A. I wanted to know what happened to her. I explained, what happened to you? She said she puked, which I knew to be true. Mom after we went into the room she threw up all over herself and on the bed.

Q. So she in fact—[J.R.] in fact described for you an actual thing? What had just happened?

A. Had happened I don't know probably a half hour by the time maybe a little longer or so from the prior time we essentially arrived to the time-wise speaking with her and doing the interview.

21

RP at 586-87.

Denis Mulamba testified in his own defense. Mulamba testified that he and Ashley Eli argued over the disciplining of her children. He denied ever hitting S.E. or J.R. Instead, Mulamba blamed the children's injuries on Eli, testifying that he saw Eli hit J.R. on the hands with a wire. Mulamba testified that he was unaware that the children needed medical treatment.

The jury found Denis Mulamba guilty as charged on counts one through three: assault of a child in the first degree against J.R., assault of a child in the second degree against S.E., and criminal mistreatment in the first degree against J.R. For these three offenses, the jury also found by special verdict that J.R. and S.E. were "particularly vulnerable or incapable of resistance." CP at 479-80, 483. On count four, the jury found Mulamba not guilty of criminal mistreatment in the second degree against S.E., but guilty of the lesser offense of criminal mistreatment in the third degree.

The trial court imposed an exceptional sentence above the standard range for counts one, two, and three based on the jury's special verdict finding. The trial court sentenced Denis Mulamba to 20 years on count one, 10 years on count two, 10 on count three, and no time on count four. The court ordered the sentences to run consecutively, for a total of 40 years.

## LAW AND ANALYSIS

On appeal, Denis Mulamba contends: (1) the trial court erred when it admitted J.R.

22

and S.E.'s hearsay statements under RCW 9A.44.120, (2) Marti Miller's comment of J.R.'s veracity violated Mulamba's right to a jury trial, and (3) the trial court erred in imposing an exceptional sentence based on the jury's special verdict finding that S.E. was particularly vulnerable. We address the contentions in this order.

## J.R. Competency to Testify

As a precursor to his argument that RCW 9A.44.120 did not sanction admission of J.R.'s hearsay statements uttered to others, Denis Mulamba challenges J.R.'s competency to testify. Presumably this argument extends to J.R.'s trial testimony. In arguing that J.R. was an incompetent witness, Denis Mulamba does not review J.R.'s trial testimony, but rather focuses on the pretrial interview with Marti Miller to argue that J.R. did not understand the obligation to speak the truth, and J.R. failed to recall anything that happened beyond generalized statements about being spanked with a belt. Mulamba contends that impediments to J.R.'s competency precluded introduction of her statements through the testimony of others under the child hearsay statute.

Denis Mulamba challenges J.R.'s competency as a witness based on her young age. Therefore, we review rules addressing child witnesses. Under ER 601:

> Every person is competent to be a witness except as otherwise provided by statute or by court rule.

In turn, RCW 5.60.050 provides:

> The following persons shall not be competent to testify:
> (1) Those who are of unsound mind, or intoxicated at the time of

23

No. 31314-0-III
*State v. Mulamba*

their production for examination, and
(2) Those who appear incapable of receiving just impressions of the facts, respecting which they are examined, or of relating them truly.

Before a 1986 amendment, RCW 5.60.050(2) read: "*Children under ten years of age, who appear incapable of receiving just impressions of the facts, respecting which they are examined, or of relating them truly.*" LAWS OF 1986, ch. 195, § 2. The legislative amendment suggests children under the age of ten may be suitable witnesses. *State v. S.J.W.*, 170 Wn.2d 92, 100, 239 P.3d 568 (2010).

Because RCW 5.60.050 no longer references age, the default rule that all witnesses are presumed competent to testify applies to child witnesses. *State v. S.J.W.*, 170 Wn.2d at 100. The burden is on the party opposing testimony from the witness to prove incompetence. *S.J.W.*, 170 Wn.2d at 100. A party challenging the competency of a child witness has the burden of rebutting that presumption with evidence indicating that the child is incapable of receiving just impressions of the facts or incapable of relating facts truly. *S.J.W.*, 170 Wn.2d at 102.

In *State v. Allen*, 70 Wn.2d 690, 424 P.2d 1021 (1967), our Supreme Court listed five factors for assessing a child's competency to testify. Although *Allen* was decided before the 1986 amendment to RCW 5.60.050, our Supreme Court continues to instruct trial courts to utilize the five factors when assessing competency. *S.J.W.*, 170 Wn.2d at 97. Those considerations are:

(1) an understanding of the obligation to speak the truth on the

24

witness stand; (2) the mental capacity at the time of the occurrence concerning which he is to testify, to receive an accurate impression of it; (3) a memory sufficient to retain an independent recollection of the occurrence; (4) the capacity to express in words his memory of the occurrence; and (5) the capacity to understand simple questions about it.

*State v. Allen*, 70 Wn.2d at 692 (1967). The child must not only be able to relate facts truly at the time of trial, but must have been capable of receiving just impressions of the facts at the time of the events about which she testifies. *Allen*, 70 Wn.2d at 691.

The *Allen* court also identified the proper appellate standard of review, a standard important to our decision affirming the trial court. The *Allen* court wrote:

> The determination of the witness's ability to meet the requirements of this test and the allowance or disallowance of leading questions rest primarily with the trial judge who sees the witness, notices his manner, and considers his capacity and intelligence. These are matters that are not reflected in the written record for appellate review. Their determination lies within the sound discretion of the trial judge and will not be disturbed on appeal in the absence of proof of a manifest abuse of discretion.

70 Wn.2d at 692 (citation omitted). The defendant bears the burden of establishing that the trial court abused its broad discretion when permitting child testimony. *State v. Woods*, 154 Wn.2d 613, 622, 114 P.3d 1174 (2005). In *Allen*, the Supreme Court affirmed a trial court finding that a six-year-old was competent to testify.

J.R. was five years of age at the time of trial. In the following decisions, the courts held a five-year-old child competent to testify: *State v. Avila*, 78 Wn. App. 731, 734, 899 P.2d 11 (1995); *State v. Hunsaker*, 39 Wn. App. 489, 693 P.2d 724 (1984); and *State v. Woodward*, 32 Wn. App. 204, 207, 646 P.2d 135 (1982). In the following

25

decisions, the courts held a four-year-old competent to testify: *State v. Woods*, 154 Wn.2d 613, 616, 114 P.3d 1174 (2005); *State v. Perez*, 137 Wn. App. 97, 100, 105, 151 P.3d 249 (2007); *State v. Borland*, 57 Wn. App. 7, 9, 11, 786 P.2d 810 (1990), *overruled on other grounds by State v. Rohrich*, 132 Wn.2d 472, 939 P.2d 697 (1997); *State v. Strange*, 53 Wn. App. 638, 639, 642, 769 P.2d 873 (1989); *State v. Acheson*, 48 Wn. App. 630, 631, 637-38, 740 P.2d 346 (1987); and *State v. Walker*, 38 Wn. App. 841, 845-46, 690 P.2d 1182 (1984). In *Borland*, the child encountered difficulty in responding to some questions and inconsistencies were found in her statements. In *State v. Carlson*, 61 Wn. App. 865, 868, 812 P.2d 536 (1991), the court allowed testimony from a child who was three and one-half years old at the time of the abuse. In *State v. Bailey*, 52 Wn. App. 42, 757 P.2d 541 (1988), the court permitted testimony from a three-year-old victim.

Excerpts of Marti Miller's interview of J.R. raise a legitimate concern of the truthfulness of J.R. Eventually, J.R. identified Denis Mulamba as having injured her with belt whippings. Nevertheless, J.R. first stated that no one lived with her other than her mother and brother. Then after a leading question, J.R. said someone else lived with her, but she did not know who and whether that someone was a boy or girl. She first told Miller that she caused the injuries on her rear end by scratching herself during sleep. She denied knowing the source of her arm and head injuries. She denied knowing the name of Denis Mulamba. She testified that her mom slapped her.

Denis Mulamba accentuates *Allen* factor one that demands that a child understand

the obligation to speak the truth on the witness stand. Denis Mulamba contends that Ashley Eli's instructions to J.R. to conceal the identity of her boyfriend evidence a strong motive to lie rather than a recognition of an obligation to tell the truth. The trial court disagreed and entered a conclusion of law that read: "The recordings make it clear that the children understand both what it means to tell the truth and why it is important to tell the truth." CP at 568. This conclusion may be more in the nature of a finding of fact, or a mixed finding and conclusion. A finding of fact erroneously described as a conclusion of law is reviewed as a finding of fact. *Willener v. Sweeting*, 107 Wn.2d 388, 394, 730 P.2d 45 (1986).

We conclude that the trial court could reasonably conclude J.R. understood the obligation to tell the truth. A review of the Miller interview shows a struggle between J.R. wishing to tell the truth and wishing to obey her mother's direction to pretend a lack of knowledge of the boyfriend's name and his devastating behavior. In the end, the obligation to tell the truth prevailed.

Denis Mulamba also contends that J.R. lacked the capacity to express in words her memory of what occurred, the fourth *Allen* factor. Mulamba argues that Ashley Eli's instructions to J.R. to hide the truth and Marti Miller's comments to J.R. as to which of her statements were true corrupted J.R.'s ability to express what happened in her own words. The trial court entered a number of conclusions that conflict with Mulamba's argument. The trial court found that J.R. understood simple questions and intelligently

27

responded corresponding with her age; J.R. demonstrated a good sense of timing and was able to recall and describe what happened; and, when the defendant's attorney questioned J.R., she was able to recall what physical acts of abuse defendant inflicted on her. We conclude substantial evidence supports these findings, and the trial court did not abuse her discretion in so finding.

Marti Miller told J.R.: "you did a good job cause we promised to tell the truth today, remember and the truth is that you got spanked on the butt with a belt and then sometimes with a hand." CP at 671. Miller's remarks may not provide a model of child interrogation, but the remarks' potential danger of leading J.R. pale when viewed in context of the entire interview. Contextually, Miller merely reminded J.R. to be truthful, and then reminded J.R. of what she had just said in order to ask clarifying questions. After Miller's remarks, J.R. consistently stated that Denis Mulamba beat her with a belt after her family moved to Ellensburg. Although J.R. repeatedly conceded that she could not remember much beyond basic facts, she recalled those facts consistently and accurately without embellishment.

Denis Mulamba notes that the transcripts and recording on which the trial court relied are available to this court. Therefore, he encourages this court to make an independent review of the competency of J.R. We have done so. While this court may examine the entire record, we must afford significant deference to the trial judge's competency determination. *State v. Brousseau*, 172 Wn.2d 331, 340, 259 P.3d 209

(2011). There is probably no area of law where it is more necessary to place great reliance on the trial court's judgment than in assessing the competency of a child witness. *State v. Borland*, 57 Wn. App. at 11 (1990).

Denis Mulamba faults the trial court for failing to enter an express finding of fact that J.R. was competent to testify. This argument ignores the rule that Mulamba carried the burden to prove that J.R. lacked competency. *State v. S.J.W.*, 170 Wn.2d at 102 (2010). The absence of a finding on a material issue is presumptively a negative finding entered against the party with the burden of proof. *Golberg v. Sanglier*, 96 Wn.2d 874, 880, 639 P.2d 1347 (1982); *Pilling v. E. & Pac. Enters. Trust*, 41 Wn. App. 158, 165, 702 P.2d 1232 (1985). The trial court expressly found that no evidence showed J.R. to lack competency.

Denis Mulamba argues that, under *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), since incompetence rendered J.R. unavailable to testify, any of her testimonial hearsay statements would have been inadmissible. Since we hold the trial court did not abuse its discretion in holding J.R. competent, we reject this additional contention.

### Child Hearsay Statute

We now address Denis Mulamba's assignment of error based on the trial court's admission of testimony by Marti Miller and Detective Weed of statements uttered by S.E.

and J.R. RCW 9A.44.120 governs the admissibility of child hearsay. The statute

provides in pertinent part:

> A statement made by a child when under the age of ten describing
> . . . any act of physical abuse of the child by another that results in
> substantial bodily harm as defined by RCW 9A.04.110, not otherwise
> admissible by statute or court rule, is admissible in evidence in . . .
> criminal proceedings . . . if:
> (1) The court finds, in a hearing conducted outside the presence of
> the jury, that the time, content, and circumstances of the statement provide
> sufficient indicia of reliability; and
> (2) The child either:
> (a) Testifies at the proceedings; or
> (b) Is unavailable as a witness: PROVIDED, That when the child is
> unavailable as a witness, such statement may be admitted only if there is
> corroborative evidence of the act.

In order to admit a hearsay statement made by a child under the age of ten, the

court must find that the statement is reliable. *State v. Beadle*, 173 Wn.2d 97, 111-12, 265

P.3d 863 (2011). The underlying issue in any RCW 9A.44.120 determination is whether

the time, content, and circumstances of the statement provide sufficient indicia of

reliability. *State v. Carlson*, 61 Wn. App. 865, 872, 812 P.2d 536 (1991).

> In determining the reliability of child hearsay statements, the trial
> court considers nine factors: (1) whether there is an apparent motive to lie,
> (2) the general character of the declarant, (3) whether more than one person
> heard the statement, (4) the spontaneity of the statements, (5) the timing of
> the declaration and the relationship between the declarant and the witness,
> (6) whether the statement contained express assertions of past fact,
> (7) whether the declarant's lack of knowledge could be established through
> cross-examination, (8) the remoteness of the possibility of the declarant's
> recollection being faulty, and (9) whether the surrounding circumstances
> suggested the declarant misrepresented the defendant's involvement.

*State v. Kennealy*, 151 Wn. App. 861, 880, 214 P.3d 200 (2009) (citing *State v. Ryan*, 103 Wn.2d 165, 175-76, 691 P.2d 197 (1984)). Courts refer to these nine considerations as the *Ryan* factors.

We review a trial court's admission of child hearsay statements for abuse of discretion. *State v. Borboa*, 157 Wn.2d 108, 121, 135 P.3d 469 (2006). A trial court abuses its discretion only when its decision is manifestly unreasonable or is based on untenable reasons or grounds. *State v. C.J.*, 148 Wn.2d 672, 686, 63 P.3d 765 (2003).

Denis Mulamba argues that the testimony of the two children through the adult witnesses conflicts with *Ryan* factor one. Mulamba contends that Ashley Eli's instructions to her children to conceal the identity of her boyfriend evidence a strong motive to lie. This argument may be misplaced because any prevarication motivated by Eli's directions benefitted, not prejudiced Mulamba. The *Ryan* factor may assume that a child will lie to harm the accused, not help the accused. Regardless, the children's disclosure of Eli's instructions might lead the trial court to conclude S.E. and J.R. each understood the importance of being truthful, despite maternal directions to the contrary.

Denis Mulamba also argues that J.R. engaged in demonstrable lies. We agree, but the trial court could conclude that, despite the initial prevarications, J.R. told the truth as the interviews progressed. In *Gilson v. State*, 8 P.3d 883, (Okla. Crim. App. 2000), the reviewing court affirmed a trial court admission of victim statements under Oklahoma's child hearsay statute, despite earlier lying by the victims, because the record also showed

31

the children understood the obligation to tell the truth.

The trial court did not expressly find that neither child lacked a motivation to lie. We do not consider this omission error, however, since no single *Ryan* factor controls and the trial court's reliability assessment is based on an overall evaluation of the factors. *Kennealy*, 151 Wn. App. at 881. The trial court found that each child comprehended the obligation to speak the truth. The trial court resolved this question of fact in favor of finding the children reliable, and Mulamba identifies no legitimate reason to conclude that the children wished to lie.

Denis Mulamba contends that S.E.'s and J.R.'s statements were not spontaneous as listed as *Ryan* factor four. He emphasizes that the children uttered the statements within the context of a forensic interview for the express purpose of determining who injured them and how. The law does not support this contention. For purposes of a child hearsay analysis, spontaneous statements are statements the child volunteered in response to questions that were not leading and did not in any way suggest an answer. *Carlson*, 61 Wn. App. at 872. Mulamba concedes that the interviewers' questions generally did not suggest an answer. Thus, the trial court did not err when it found that S.E. and J.R.'s answers were spontaneous.

Denis Mulamba asserts, concerning *Ryan* factor eight, that no evidence supports the trial court's conclusion that: "The children demonstrate a good sense of timing and being able to recall and describe what happened;" and "Any omissions, by the children,

are not the result of faulty recollection as opposed to the children just not wanting to talk about what they do not want to talk about." CP at 823. The trial court noted that it reviewed law enforcement's video-taped interviews of the children and transcripts of defense counsel's interviews prior to the hearing. An independent review of those interview transcripts shows that the children answered questions directly and declined to answer when they did not know the answer, could not understand the question, or desired not to answer. Regardless, whether S.E. and J.R. demonstrated a good sense of timing and recall are matters of credibility. Independent appellate review does not extend to factual determinations such as findings on credibility. *State v. Johnston*, 156 Wn.2d 355, 365-66, 127 P.3d 707 (2006).

Denis Mulamba argues that, during the interviews, J.R. often stated she did not remember or she did not know. We concede this fact, but the fact does not require reversal of the trial court's ruling. Even adult witnesses do not remember all details of events. Some of J.R.'s lack of memory resulted from a desire to protect Mulamba. After J.R. felt comfortable telling the truth, she provided sufficient detail to evidence the reliability of her statements.

The trial court did not abuse its discretion when it found S.E. and J.R.'s statements to be sufficiently reliable under the child hearsay statute.

Scope of RCW 9A.44.120.

Denis Mulamba contends Marti Miller's testimony exceeded RCW 9A.44.120's scope of statements describing acts of physical abuse. RCW 9A.44.120 renders admissible hearsay statements "describing any act of physical abuse of the child by another that results in substantial bodily harm." To this end, the trial court ruled that the adult witnesses could only testify to a child's statement about that child's injuries. The logical extension of this ruling was that the adult interviewer may not testify to a remark one child uttered about injuries to his or her sibling.

Denis Mulamba goes further and challenges Marti Miller's hearsay testimony of statements made by the children that did not involve injuries. Mulamba complains about Miller's testimony regarding: when S.E. indicated the family moved to Ellensburg, the children's statements that Eli did not participate in the beatings, and J.R.'s statements that Ashley Eli instructed her to not identify Mulamba by name.

Denis Mulamba failed to preserve these challenges with objections before the trial court. The proper way to approach errors raised for the first time on appeal is, first, to determine whether the error is truly of constitutional magnitude; if the error fails this test, the court will refuse review. *State v. Quigg*, 72 Wn. App. 828, 834, 866 P.2d 655 (1994); RAP 2.5. If both the child hearsay declarant and the hearsay recipients testify at trial and are subject to full cross-examination, no issue of truly constitutional magnitude is involved. *Quigg*, 72 Wn. App. at 834. S.E., J.R., and Marti Miller all testified. Thus,

34

any error is not constitutional in nature. Because Mulamba failed to object at trial, we refuse review of this challenge.

Denis Mulamba objected at trial when Marti Miller testified to: S.E.'s statements about how many times he was beaten, J.R.'s statements that Mulamba beat S.E., and S.E.'s statements that Mulamba threatened to burn him with an iron and beat him to death. RCW 9A.44.120 encompasses statements "describing any act of physical abuse of the child by another that results in substantial bodily harm." S.E.'s statement that Mulamba beat him multiple times falls within the scope of the statute, because Dr. Feldman testified that S.E.'s injuries were caused by multiple blows. The cumulative impact of those blows resulted in substantial bodily harm.

The statements from one victim about the other victim's abuse are not admissible under RCW 9A.44.120. *State v. Alvarez-Abrego*, 154 Wn. App. 351, 365, 225 P.3d 396 (2010). The State concedes error in testimony of S.E.'s statement about J.R.'s injuries. The adult witnesses' repetition of S.E.'s comments about threats to him was likewise inadmissible, because the threats are not "acts" of physical abuse under RCW 9A.44.120. The words themselves did not cause S.E. bodily harm. The erroneous admission of this evidence does not warrant reversal, however.

As already discussed, errors surrounding admissibility of evidence under RCW 9A.44.120 do not implicate constitutional concerns when the victims and the hearsay recipients all testified. *Quigg*, 72 Wn. App. at 834. Thus, we apply the nonconstitutional

harmless error standard. Under this leaner standard, any error was harmless unless, within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected. *State v. Hancock*, 46 Wn. App. 672, 678-79, 731 P.2d 1133 (1987), *aff'd*, 109 Wn.2d 760, 748 P.2d 611 (1988). Here, the critical issue was whether the jury found Denis Mulamba, who testified in his own defense, more credible than Ashley Eli, as to who harmed the children. J.R.'s statements regarding S.E.'s abuse merely echoed S.E.'s statements. *See, e.g., Hancock*, 46 Wn. App. at 679. In the larger context of Mulamba's seven day trial, there is no reasonable probability that the error affected the trial's outcome.

### Comment on J.R.'s Veracity

Denis Mulamba contends that Marti Miller's comment of J.R.'s veracity violated his right to a jury trial. Mulamba identifies the following testimony as impermissible opinion testimony from Marti Miller: "I wanted to know what happened to her. I explained, what happened to you? *She said she puked, which I knew to be true.*" RP at 587 (emphasis added).

In determining whether statements are impermissible opinion testimony, the court will consider the circumstances of the case, including the following factors: (1) the type of witness involved, (2) the specific nature of the testimony, (3) the nature of the charges, (4) the type of defense, and (5) the other evidence before the trier of fact. *State v. Kirkman*, 159 Wn.2d 918, 928, 155 P.3d 125 (2007). The second factor, the nature of the

36

testimony, is sufficient to show that Miller's comment was innocuous. The phrase

"which I knew to be true" refers only to "[J.R.] said she puked." RP at 587. The State

clarified that Miller's comment was limited to "[w]hat had just happened." RP at 587.

The comment does not concern J.R.'s overall veracity, but only whether the child had

recently vomited. Whether the young child vomited at the hospital that day had no

bearing on the issue of who caused her injuries. Thus, we find no error.

### Particularly Vulnerable Victim

Denis Mulamba contends the trial court erred when imposing an exceptional

sentence on count three, second degree assault of S.E., based on the jury's special verdict

finding that S.E. was particularly vulnerable. He argues that S.E. is not "particularly

vulnerable" because he was eight years old, attended school, dressed and bathed himself,

prepared simple meals, and has no physical or mental impairments. Mulamba cites no

case authority to support the conclusion that any of these factors disqualifies a child from

being "particularly vulnerable."

RCW 9.94A.535(3)(b) allows the imposition of an exceptional sentence when

"[t]he defendant knew or should have known that the victim of the current offense was

particularly vulnerable or incapable of resistance." When age is an element of the crime,

the victim's age may also be used as a justification for departure from the standard

sentencing range if the extreme youth of the victim in fact distinguishes the victim

significantly from other victims of the same crime. *State v. Garibay*, 67 Wn. App. 773,

37

779, 841 P.2d 49 (1992), *abrogated on other grounds by State v. Moen*, 129 Wn.2d 535, 919 P.2d 69 (1996). The second degree assault of a child statute already contemplates the victim's age by limiting its application to children "under the age of thirteen." RCW 9A.36.130. S.E. was eight years old, and there was no evidence that he was somehow disabled, physically or mentally.

After this court's opinion in *Garibay*, the legislature amended the aggravating factor such that it is no longer limited to "extreme youth." As late as 2004, former RCW 9.94A.535(2)(b) provided: "The defendant knew or should have known that the victim . . . was particularly vulnerable or incapable of resistance due to *extreme youth, advanced age, disability, or ill health*." (Emphasis added); *see, e.g., State v. Suleiman*, 158 Wn.2d 280, 288, 143 P.3d 795 (2006). But in 2005, our legislature reorganized RCW 9.94A.535 in response to the United States Supreme Court's ruling in *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004). LAWS OF 2005, ch. 68. As part of this reorganization, the legislature recodified the aggravating factor at RCW 9.94A.535(3)(b), and deleted the categorical limitations of "extreme youth, advanced age, disability, or ill health." LAWS OF 2005, ch. 68, § 3. Such a deletion evinces the legislature's intent. *See, e.g., State v. Ratliff*, 140 Wn. App. 12, 16, 164 P.3d 516 (2007). The aggravating factor for particularly vulnerability is no longer limited to those categories.

For the aggravating factor to apply, some fact must distinguish the victim

significantly from other victims of the same crime. *Garibay*, 67 Wn. App. at 779. The facts of this case distinguish S.E. from other victims. S.E. was particularly vulnerable because of his mother's complicity, or at least willful ignorance, toward the abuse. Ashley Eli acquiesced to Denis Mulamba's discipline of her children. Sufficient evidence supports the jury's finding that S.E. was particularly vulnerable, which, in turn, supports the trial court's exceptional sentence. *See State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

## CONCLUSION

We affirm all convictions upon Denis Mulamba and the sentence imposed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Korsmo, J.

_____
Lawrence-Berrey, J.

39